IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JAMES FALCON, on Behalf of Himself and Others Similarly Situated, **Plaintiffs**, | § § § § | |
| vs. STARBUCKS CORPORATION and DOES 1 through 100, **Defendants**. | § § § § § § | CIVIL ACTION NO. H-05-0792 |

# PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DECERTIFY COLLECTIVE ACTION

"If one zooms in close enough on anything, differences will abound; even for a single employee doing a single job, the amount of time that she spends [working off-the-clock]...on Monday will differ, at least minutely, from the amount of time that she spends...on Tuesday. But plaintiffs' claims need to be considered at a higher level of abstraction."[1]

---

[1] *Frank v. Gold'N Plump Poultry, Inc.*, 2007 WL 2780504, at *4 (D. Minn. Sept. 24, 2007)(discussing off the clock work in the context of donning and doffing).

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii-iii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv-viii

PLAINTIFF'S RESPONSE TO DEFENDANT'S
MOTION TO DECERTIFY COLLECTIVE ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.    STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

IV.     SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

V.      STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        Part I: Undisputed Similarities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        A.      Defendant's Stores are Organized Identically
                around the United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        B.      ASMs Were "Exempt" Prior to October 2002 . . . . . . . . . . . . . . . . . . . . . . . 5

        C.      All ASMs Became "Non-Exempt" After Reclassification . . . . . . . . . . . . . . . . 5

        D.      ASMs Expected to Work Overtime After Reclassification . . . . . . . . . . . . . . . 5

        E.      Policy:  Overtime Was to be Avoided . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        F.      Labor Budget Did Not Increase After Reclassification . . . . . . . . . . . . . . . . . 7

        G.      ASM Job Duties and Time Constraints . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        Part II: The Job Description Project . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

VI.     THE LAW REGARDING COLLECTIVE ACTIONS . . . . . . . . . . . . . . . . . . . . . . . . 11

        A.      Collective Actions Under the FLSA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        B.      The "Similarly Situated" Requirement . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

VII.    PLAINTIFFS ARE SIMILARLY SITUATED .............................. 15

    A.    Plaintiffs' Employment Setting Demonstrates That They Are Similarly Situated. 15

        1.    ASM Job Duties Were the Same Nationwide ..................... 15

        2.    ASMs Worked Off the Clock ................................ 16

        3.    ASMs Were Subject to the Same Supervision ................... 17

        4.    ASMs Were Subject to the Same Pay Provisions ................. 17

    B.    The Defenses Alleged by Defendants Are Not Individualized and Are Without Merit ...................................................... 17

        1.    Defendant Has Alleged No Individualized Defenses Against Plaintiffs .. 17

            a.    Management Knowledge ............................ 18

            b.    *De Minimis* ...................................... 21

            c.    Voluntariness .................................... 22

    C.    Fairness and Procedural Considerations Support Moving Forward With the Collective Action. .......................................... 24

        1.    Considerations of Fairness Support Maintaining This Collective Action .................................... 24

        2.    The Court Has the Necessary Means to Ensure a Manageable Trial ...................................... 25

            a.    Representative Testimony ........................... 25
            b.    Bifurcation ...................................... 27
            c.    Subclasses ...................................... 27

VIII.   CONCLUSION ..................................................... 28

# TABLE OF AUTHORITIES

A.    Cases

*Anderson v. Cagle's Inc.*
488 F.3d 945 (11th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

*Anderson v. Mt. Clemens Pottery Co.*
328 U.S. 680 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27

*Ayers v. SGS Control Servs.*
2007 WL 646326 (D.N.Y. Feb. 27, 2007)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

*Burry v. Nat'l Trailer Convoy, Inc.*
338 F.2d 422 (6th Cir. 1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

*Bradford v. Bed Bath & Beyond, Inc.*
184 F.Supp.2d 1342 (N.D. Ga. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

*Brennan v. General Motors Acceptance Corp.*
482 F.2d 825 (5th Cir. 1973)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18, 20, 26

*Clark v. Dollar Gen. Corp.*
2001 WL 878887 (M.D. Tenn. May 23, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

*Cunningham v. Gibson Elec. Co., Inc.*
43 F.Supp.2d 965 (N.D. Ill. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

*Donovan v. Bel-Loc Diner, Inc.*
780 F.2d 1113 (4th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26

*Donovan v. Brandel*
736 F.2d 1114 (6th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25

*Donovan v. Williams Oil Co.*
717 F.2d 503 (10th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26

*Dunlop v. Carriage Carpet Co.*
548 F.2d 139 (6th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25

*Frank v. Gold'N Plump Poultry, Inc.*
2007 WL 2780504 (D. Minn. Sept. 24, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

*Goldberg v. Kickapoo Prairie Broad.*
288 F.2d 778 (8th Cir. 1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Gulf King Shrimp Co. v. Wirtz*
407 F.2d 508 (5th Cir. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Hayes v. Laroy Thomas, Inc.*
No. 5:05CV227 (E.D. Tex. Apr. 3, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Hayes v. Laroy Thomas, Inc.*
2007 WL 1174313 (E.D. Tex. Apr. 19, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Hill v. Muscogee County Sch. Dist.*
2005 WL 3526669 (M.D. Ga. Dec. 20, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Hipp v. Liberty Nat'l Life Ins. Co.*
252 F.3d 1208 (11th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Hoffman-La Roche, Inc. v. Sperling*
493 U.S. 165 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Hyman v. First Union Corp.*
982 F.Supp. 1 (D.D.C. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*In re Delta Air Lines*
310 F.3d 953 (6th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Johnson v. City of Columbia*
949 F.2d 127(4th Cir.1991) (en banc) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Lusardi v. Xerox Corp.*
118 F.R.D. 351 (D.N.J. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Martinez v. Food City, Inc.*
658 F.2d 369 (5th Cir.1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Mireles v. Frio Foods, Inc.*
899 F.2d 1407 (5th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Montoya v. Rescue Industries, Inc.*
176 F.3d 489 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

v

*Mooney v. Aramco Servs. Co.*
54 F.3d 1207 (5th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 12, 13, 15

*Moss v. Crawford & Co.*
201 F.R.D. 398 (W.D. Pa. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Myers v. The Copper Cellar Corp.*
1996 U.S. Dist LEXIS 20509 (E.D. Tenn. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*National Electro-Cotings, Inc. v. Brock*
1988 U.S. Dist. LEXIS 16937 (N.D. Ohio) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 26

*Nerland v. Caribou Coffee Co., Inc.*
No. 05-1847 (D. Minn. Apr. 6, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Nerland v. Caribou Coffee Co., Inc.*
No. 05-1847 (D. Minn. May 17, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Newton v. City of Henderson*
47 F.3d 746 (5th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Orvis v. Triple Ace Investments, LLC*
2007 WL 1625763 (M.D. Fla. June 5, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Pendlebury v. Starbucks Coffee Co.*
No. 04-80521 (S.D. Fla. September 21, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-10, 14-15

*Posner v. Showroom Inc.*
762 F.2d 1010 (6th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Rawls v. Augustine Home Health Care, Inc.*
2007 WL 1952988 (D. Md. July 5, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Reich v. Gateway Press*
13 F.3d 685 (3rd Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Riojas v. Seal Produce, Inc.*
82 F.R.D. 613 (S.D. Tex. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Rodolico v. Unisys Corp.*
199 F.R.D. 468 (E.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Roman v. Korson*
152 F.R.D. 101 (W.D. Mich. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Secretary of Labor v. DeSisto*
929 F.2d 789 (1st Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Shaffner v. Cash Register Sales & Serv.*
2006 WL 1007542 (S.D. Tex. April 17, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Thiessen v. General Elec. Capital Corp.*
267 F.3d 1095 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12-13, 18

*Tucker v. Labor Leasing, Inc.*
872 F.Supp. 941 (M.D. Fla. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Tumminello v. United States*
14 Cl. Ct. 693(1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-12

*Vaszlavik v. Storage Tech. Corp.*
175 F.R.D. 672 (D. Colo. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Villatoro v. Kim Son Restaurant, L.P.*
286 F.Supp.2d 807 (S.D. Tex. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Wilks v. Pepboys*
2006 WL 2821700 (M.D. Tenn. Sept. 26, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 24

B.    Regulations

29 U.S.C. § 201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
29 U.S.C. § 216(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 11-12
29 C.F.R. § 553.101(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
29 C.F.R. § 785.13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
29 C.F.R. § 785.47 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

C.    Rules

F.R.C.P. 42(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

### PLAINTIFF'S RESPONSE TO DEFENDANT'S
### MOTION TO DECERTIFY COLLECTIVE ACTION

Plaintiff James Falcon ("Falcon"), on behalf of himself and others similarly situated, files this Response to Defendant's Motion to Decertify Collective Action ("Response"), and would show unto the Court as follows:

### I. INTRODUCTION

This case arises out of Starbucks Corporation's attempt to cut costs and maintain profitability at the expense of its Assistant Store Managers ("ASMs"). It is uncontested that, in October 2002, Starbucks Corporation ("Starbucks" or "Defendant") reclassified its ASMs from "exempt" to "non-exempt" under the Fair Labor Standards Act ("FLSA"). This significant change meant that ASMs would be eligible for overtime pay when they worked more than 40 hours in a work week. The stark reality, however, was that following reclassification, ASMs had to work off the clock in order to complete their duties, as Defendant refused to increase the allotted store labor budgets. Thus, in order to maintain profitability, Defendant enforced an unwritten policy of requiring its ASMs to work off the clock.

### II. STATEMENT OF THE CASE

Falcon filed this lawsuit on March 11, 2005, seeking unpaid overtime pursuant to §§ 6, 7, and 16(b) of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.* Specifically, during the course of Falcon's employment as a "non-exempt" ASM, Defendant failed to pay Falcon for all hours worked in excess of 40 hours in a given workweek. Falcon filed this lawsuit as a collective action pursuant to 29 U.S.C. § 216(b). In November 2005, this Court conditionally certified the case as a collective action and authorized Falcon to send notice to the putative class.[2] (*See* Memorandum

---

[2] Falcon mailed out 11,000 letters nationwide. However, several thousand were returned as 'undeliverable,' due in part to the transient nature and age of the class, and due in part to late mailings resulting from confusion with the mail service.

and Order dated November 29, 2005, Docket No. 53.)  By the end of the notice period, 371 individuals from across the United States had joined the collective class.[3]  Since that time, the parties have conducted discovery touching upon the "similarly situated" analysis.  On November 15, 2007, Defendant filed a motion asking the Court to decertify the class.  (*See generally* Defendant's Memorandum of Law in Support of Motion to Decertify Class ("Defendant's Motion")).  For the reasons set forth below, Defendant's Motion should be denied and the case should be permitted to proceed to a trial on the merits as a collective action.

## III.  STATEMENT OF THE ISSUES

The sole issue before this Court is whether the opt-in Plaintiffs are "similarly situated" to Falcon and one another.  This Court has previously determined that the proper legal standard in evaluating this inquiry is the two-stage *Lusardi* method.  *Shaffner v. Cash Register Sales & Serv.*, 2006 WL 1007542 (S.D. Tex. April 17, 2006) (applying *Lusardi v. Xerox Corp.*, 118 F.R.D. 351, 359 (D.N.J. 1987)).  The first stage is used to determine whether to conditionally certify the class and allow notice.  *Id.* at 754-55.  During the second stage, after sufficient discovery, the Court makes a factual determination as to whether the collective class members are similarly situated to the Plaintiff.  *Id.* at 755.  Substantial discovery has occurred in this case, and Plaintiffs now ask the Court to permit this action to proceed to trial as a collective action.

Because the Fifth Circuit has yet to adopt a specific standard for determining the decertification issue, it uses a two-part standard of review.  *Id.* (citing *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1210 (5th Cir. 1995)).  The legal standard applied by the district court is reviewed *de novo*.  *Id.*  The district court's application of that standard is reviewed for abuse of discretion.  *Id.*

---

[3] Plaintiff Falcon and the collective class will be collectively referred to as "Plaintiffs" in this Response.

## IV. **SUMMARY OF THE ARGUMENT**

As set forth above, Defendant reclassified its ASMs from "exempt" to "non-exempt" under the FLSA in October 2002. Prior to the reclassification, Defendant expected its ASMs to work as many hours as necessary to complete the tasks required of them.

In fact, it was common for ASMs to work hours in excess of 40 in a week. However, because ASMs were considered "exempt" prior to the reclassification, Defendant did not monitor how much time ASMs were spending performing such tasks.

Following reclassification, ASMs continued to perform the exact same job duties as they had prior to reclassification. Indeed, Defendant knew that its ASMs would continue to work overtime after the reclassification. However, Defendant did not increase the labor budget for any of its retail stores as a result of the reclassification to account for the increased workload, did not conduct an inquiry or study to determine how many hours its ASMs were required to work in order to complete their duties, nor did it make separate inquiry of the impact and effect upon ASMs after having received many separate complaints regarding the issue. Rather, Defendant embarked on a practice of trying to "control overtime" costs by instructing its ASMs to avoid overtime, or to work "off the clock." Of course, Defendant did not have a *written* policy to violate the federal wage laws. Instead, it relied upon the tried and true method of exerting pressure from above in order to guarantee its admitted goal of maintaining profitability by requesting that ASMs work overtime off the clock.

As the Court will see from the record evidence, the opt-in Plaintiffs are all similarly situated to Falcon and one another. It is undisputed that: all 372 claimants were employed as ASMs at Defendant's retail stores; they were all impacted by the same national reclassification policy; they had the same job title, the same job description, the same job duties, and the same job training; they were subjected to identical company policies; they were supervised by SMs who all worked under

3

one job description; they worked under the same pay policies; they were reviewed under the same guidelines; they were subjected to the same advancement criteria; they worked under the same budget concerns and reported through the same local, district, regional, and area hierarchies.

Discovery has further revealed substantial evidence demonstrating a single, overarching practice of Defendant to encourage Plaintiffs work off the clock. Plaintiffs were all victims of Defendant's practice that allowed, if not encouraged, this violation.

Defendant asserts no individualized defenses that would necessitate decertification of the class. Instead, Defendant asks the Court to decertify the class based upon the alleged merits of its "classwide" defenses. Although an examination of the merits is not proper in a motion to decertify—which is solely concerned with whether the collective class is similarly situated—Defendant's asserted defenses are nevertheless wholly without merit.

Finally, considerations of fairness, procedure, and judicial economy mandate that Plaintiffs, who are substantially similar in all ways relevant to Defendant's Motion and this Response, be allowed to maintain this collective action. For these reasons, the Court should deny Defendant's Motion.

## V. STATEMENT OF FACTS

**Part I: Undisputed Similarities**

### A.   Defendant's Stores Are Organized Identically Around the United States

Defendant operates retail stores throughout the United States. Stores are grouped into geographic districts, each of which has one district manager. (Chrispell Tr. at 41:4-6.) Each district manager is responsible for eight to nine stores. (*Id.* at 40: 6-11.) At the retail level, each store is typically staffed by the following complement of "partners": Store Manager, Assistant Store

4

Manager, Shift Supervisor, and Barista. (*Id.* at 24:1-12.) Defendant's corporate office provides a labor budget for each store. (*Id.* Tr. at 75:1-25 76:1-25)

### B.   ASMs Were "Exempt" Prior to October 2002

Prior to October 2002, ASMs were considered "exempt" by Defendant. (Chrispell Tr. at 318:15-24.) Accordingly, while ASMs routinely worked more than 40 hours per workweek, they were not eligible for (and did not receive) overtime compensation. (*Id.*)

### C.   All ASMs Became "Non-Exempt" After Reclassification

All ASMs became eligible for overtime on October 1, 2002. No ASM was excluded.

Q:   Now, as a result of the reclassification from exempt to non-exempt effective September 30, 2002, assistant managers became eligible for overtime, correct?

A:   Assistant store managers became eligible for overtime **everywhere in the United States** on that day, yes.

(Chrispell Tr. at 318:15-20.)

### D.   ASMs Expected to Work Overtime After Reclassification

After reclassification, Starbucks knew that ASMs were going to continue working more than forty (40) hours per week.

Q:   So let's get clear. That was an expectation that some Assistant Store Managers would work overtime?

A:   Yes.

Q:   Okay and do you have a sense of an average of how much overtime assistant store managers were typically working after September 30, 2002?

A:   I did at the time. I don't have a recollection now of how much the average was.

Q:   Do you recall whether it was a minute a week, or hours a week?

A:   No, it was in hours. My best estimate is that it was somewhere around 1 and ½ to 2.

(Chrispell Tr. at 309:17-25, 310:1-14.)

5

### E.   Policy:  Overtime Was to be Avoided

Despite its expectation that ASMs would continue to work overtime, Defendant's practice

was to discourage ASMs from working overtime.

Q:   Is it fair to say that in the training session that led to this feedback, it was stressed that overtime by assistant store managers was to be avoided?

A:   **It was stressed that it was to be avoided, but it was not stressed that it was problematic if overtime happened.  We knew right from the get go that there were going to be overtime implications to this change for every partner everyday.**

(Chrispell Tr. at 188:24-25, 189:1-6.)

Q:   And the smartest way possible was to avoid overtime for assistant store managers as much as possible, correct?

A:   **Right.  As I said before, we discouraged overtime.**

(*Id.* at 305:2-5.)

Q:   Is it fair to say that the expectation that assistant store managers limit their work to 40 hours a week is partly based on the company's desire to avoid paying overtime?

A:   It's certainly based on our desire to control expenses. And to the extent that overtime is an expense the same way as is overtime for a barista—or straight time that's above the labor budget.  So yes, in a broad category and in a specific category.

Q:   The expectation is to avoid overtime because overtime is expensive, right?

A:   The objective is to control cost.  And so yes, since overtime is a controllable cost, then yes, we'd like to control it.

(*Id.* at 372:8-21; *see also* Bejarano Tr. at 22:24-25, 23:1-2; Brantley Tr. at 65:15-25, 66:1-2; Chizmadia Tr. at 63:17-25, 64:1-3, 70:11-15; Good Tr. at 128:5-8; Huffman Tr. at 76:8-16, 78:8-14; Kooyenga-Honaker Tr. at 43:22-23; Olson-Young Tr. at 121:23-25, 122:1-3; Spear Tr. at 138:22, 139:1-5; Johnston Tr. at 53:19-22, 54:1-11, 56:15-22; Copeland Decl. at ¶ 4; Aviles Decl. at ¶ 4; Carmany Decl. at ¶ 4; Binder Decl. at ¶ 4; Moore Decl. at ¶ 4 (all stating that Defendant discouraged the payment of overtime to its ASMs); Lopez Tr. at 114:2-15 (noting that Defendant does not "ever plan for overtime."); 141:12-13.)

6

**F.   Stores Labor Budgets Did Not Increase
      After Reclassification**

Despite ASMs' reclassification, and Defendant's expectation of the overtime implications

of same, Defendant did not increase the labor budget for the retail stores.

Q:   So basically, in a more layman's term, it is fair to say stores weren't going to be given any
     more money to use to pay potential overtime costs, correct?

A:   Correct.

(Chrispell Tr. at 394:10-13.)

Q:   So what store managers were effectively told after the reclassification is that no matter how
     much work is done, now you still have to do it with the same labor budget dollars you had
     before, correct?

A:   Yes.

(*Id.* at 394:18-22.)

**G.   ASM Job Duties and Time Constraints**

Moreover, as more fully explained below, Defendant did not change the actual job duties

ASMs were required to perform, nor the amount of time required to complete those duties.  Rather,

after the reclassification, ASMs were still automatically scheduled to work 40 hours a week (*Id.* at

316:19-25, 317:1), just as they had been before the reclassification.  Moreover, the "staffing model"

did not change after the reclassification. (*Id.* at 403:21-24.)

Defendant's stated purpose for the reclassification on October 1, 2002, was to better define

the job responsibilities and duties of the partners at the retail stores.  However, in reality, ASMs' job

duties did not change.  In fact, before the reclassification, ASMs were trained on the same "training

module" as SMs, were able to perform all of the job responsibilities and duties of a SM, and were

not restricted with regard to how long they performed various "management duties" as ASM.  After

the reclassification, the job duties stayed the same; it was just the intention of Defendant to place the

"ownership" of all management functions on the SMs. But changing "ownership" of these responsibilities did not remove any of the actual job duties that ASMs were required to perform, nor the amount of time it took to perform them.

As testified to by the Plaintiffs, following the reclassification, ASMs performed the same duties they had prior to the reclassification. (Bejarano Tr. at 12:4-16 (job responsibilities did not change following reclassification); Crociani Tr. at 30:16-25, 31:1-11 (job responsibilities did not change following reclassification); Huffman Tr. at 73:4-17, 200:11-18 (performed same job duties after reclassification and worked same number of hours); Spear Tr. at 136:10-22, 137:1-16 (job duties were "exactly the same" after reclassification).)

Accordingly, although ASMs essentially had unlimited hours per week to complete their duties when they were non-exempt, following reclassification, Defendant required ASMs to complete all their duties in 40 hours or less of paid time per week. Opt-in Plaintiff Crystal Johnston described the predicament in which Defendant's practice placed ASMs:

> As it was explained to me, I had to do all of the tasks assigned to me, no matter how long those tasks would take, within my 40 hours on the clock. If I went above and beyond those 40 hours, it was reiterated again, you're not supposed to get overtime. Basically it was expressed that any instance of my going over 40 hours to complete the tasks that were assigned to me and that were my responsibilities, would be time management issues. And so either I could be potentially written up for not finishing my responsibilities or I could be potentially written up for lack of time management if I were to receive overtime. . . . It was a bit of a Catch 22.

(Johnston Tr. at 57:1-16.; *see also,* Carpenter Tr. at 197:2-18 (characterizing situation as being a "Catch 22"); Good Tr. at 196:6-22) (reference to "Catch 22": ASMs knew that if they recorded overtime, they would be reprimanded for working overtime, yet they could not complete duties in 40 hours or less per week).

The evidence is clear that ASMs' duties (and therefore the time required of them to complete

their work) did not change after the reclassification.

Q:     Did the **duties** of an ASM change after the roll out from before the roll out?

A:     The job **description** of the ASM changed.

Q:     Well, I understand that, but I guess I am going beyond what is written to what actually
       happened at the store level. Do you know if in practice ASMs did jobs that were different in
       some material way from the jobs they had done before the roll out?

A:     I would say yes and no.

(Christensen Tr. at 43:23-25; 44:1-7.)

Q:     What duties, if any, can you tell me that ASMs, per policy, were not to do post roll out that
       they had done pre-roll out?

A:     [No response.]

Q:     If you can identify one.

A:     **I can't really think of one that they couldn't do, but they wouldn't be doing them as
       sole owner of these job responsibilities.**

(*Id.* at 56:8-18.)

Q:     Was there any effort to determine, whether formal investigation or informal inquiry, whether
       assistant store managers spent less time performing their duties after September 30, 2002?

A:     I don't know…whether they spent less time doing any of their duties.

       (Chrispell Tr. at 308:3-9.)

       Just as in the *Pendlebury* case, the ASMs in *Falcon* are similarly situated. As stated in

*Pendlebury*:

                      "In sum, Starbucks' own admissions demonstrate that store managers
                      are similar in numerous ways. The store managers all follow the same
                      training protocols and all share the same duties and responsibilities.
                      In fact, the store managers' collective duties and responsibilities have
                      been used by Starbucks as justification to classify them all as exempt,

9

belying Starbucks' contention that the store managers are not similarly situated for FLSA purposes."

*Pendlebury*, at 62-63.

### Part II: The Job Description Project

In analyzing the issue of whether Plaintiffs are "similarly situated," it is important to understand the process Starbucks utilized in communicating the allegedly new job descriptions to its partners. Specifically, Defendant's "partner resource" (a/k/a human resources) department at its corporate offices in Seattle assumed overall responsibility for the nationwide project. Christine Deputy was lead on the national project of developing the job descriptions and rolling out the new performance development system nationwide. (Deputy Tr. at 24:13-20.) Robbie Dawson was project manager (*Id.* at 18:21-25), and Gretchen Frampton was project specialist. (*Id.* at 19:15-18).

In order to write the new nationwide job descriptions, Defendant collected input from focus groups held around the country. (Chrispell Tr. at 170:1-18, 171:7-172.) The purpose of the focus groups was to identify "key values" demonstrated by higher performing partners. (Dawson Tr. 35:12-13, 37:2-3, 38:6-12, 39:13-16). "Key values" referred to conduct demonstrated by high-performing partners, after whom Defendant hoped to model behavior. (*Id.* at 75:9-14) The feedback gleaned from the focus groups is what Robbie Dawson and his team utilized in coming up with the new job description for ASMs. *Id.*

As set forth above, *ad nauseam*, the job description that became effective in October 2002 was the same for ASMs all across the country. (*See, e.g.,* the ASM job description that became effective October 1, 2002 (attached as Ex. 23 to Decl. of Robert R. Debes, Jr.)).

Q:   Is it your understanding that the job description for ASMs, the one that you reviewed from 2002, that job description applied to assistant store managers around the country?

10

A:      Yeah. We used the same job description for all assistant store managers. There's not different ones in each market.
(Deputy Tr. at 11:22-25, 12:1-3.)

Once the new job descriptions had been written by Mr. Dawson and his team, they had to be rolled-out to the other partners. To do that, facilitators were selected in order to teach the regional and district managers how to incorporate the new job description into their territories. This ensured uniformity of the roll out across the country.

In order to guarantee uniformity with the way the facilitators imparted the new job descriptions to the district managers, Mr. Dawson and his team created a single Facilitator's Guide. (*Id.* at 83:13-17) (*See, e.g.,* Introducing the Performance Development System and Job Descriptions: Facilitator Guide for Assistant Store Managers ("Facilitator's Guide") (attached as Ex. 24 to Decl. of Robert R. Debes, Jr.)). The Facilitator's Guide consisted of a script prepared by Mr. Dawson and his team, as well as a Power Point presentation which was utilized during the training sessions. (Dawson Tr. at 82:7-10, 83:18-23.) Facilitators were instructed to follow the guide. Once the Regional and District Managers had been trained on the new job description program and performance review program, they imparted this information down the chain to the retail store partners.

## VI. THE LAW REGARDING COLLECTIVE ACTIONS

### A.      Collective Actions Under the FLSA

The FLSA specifically allows plaintiffs to bring actions "for and on behalf of ...themselves and other employees similarly situated." 29 U.S.C. § 216(b). Thus, "[t]he evident purpose of the [FLSA] is to provide one lawsuit in which the claims of different employees, different in amount but *all arising out of the same character of employment,* can be presented and adjudicated, regardless of the fact that they are separate and independent on each other." *Tumminello v. United States,* 14

11

Cl. Ct. 693, 696 n.4 (1988) (emphasis in original). Plaintiffs need only show that they are "similarly situated" in order to maintain a collective action. *See* 29 U.S.C. § 216(b); *see also Tumminello*, 14 Cl. Ct. at 696; *Villatoro v. Kim Son Restaurant, L.P.*, 286 F.Supp.2d 807, 808-09 (S.D. Tex. 2003).

## B. The "Similarly Situated" Requirement

The Fifth Circuit has not defined 'similarly situated' in the context of an 'off the clock' collective action. However, in *Mooney v. Aramco Servs. Co.*, the Fifth Circuit considered this term in an age discrimination collective action case brought under the ADEA, which uses the same analysis as the FLSA. 54 F.3d. 1207 (5th Cir. 1995). Notably, while the Court affirmed the district court's decertification of the class, its holding was limited to the unique factual situation presented. Namely, and contrary to the facts of the case at bar, many of the plaintiffs in *Mooney* had failed to file administrative relief prior to joining the collective action (a prerequisite under the ADEA); they worked at 93 different Aramco departments; they worked in different divisions of the company; they held distinct job titles requiring different job skills; they had different job tenures (ranging from 1 to 34 years); and they had different rates of pay. *Id.* at 1214-1215.[4]

Since *Mooney* was decided in 1995, the Tenth and Eleventh Circuit Courts of Appeal have dealt squarely with this issue and given us guidance on how to evaluate the 'similarly situated' issue. *See, i.e., Montoya v. Rescue Industries, Inc.*, 176 F.3d 489 (10th Cir. 1999) (reversing lower court's order granting decertification in an FLSA case); and *Thiessen v. General Elec. Capital Corp.*, 267 F.3d 1095 (10th Cir. 2001) (citing *Mooney* with approval); *Anderson v. Cagle's Inc.*, 488 F.3d 945

---

[4] Moreover, at the time Mooney was decided (1995), the Court found "based on our review of the case law, no representative class has ever survived the second stage of review." *Id.* at page 1214. As reflected below, the trend has since been to deny decertification.

(11th Cir. 2007) (citing *Mooney* with approval); *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208

(11th Cir. 2001) ("[T]he 'similarly situated' requirement of § 216(b) is more elastic and less stringent

than the requirements found in Rule 20 (joinder) and Rule 42 (severance)" . . . . The plaintiffs may

meet this burden, which is not heavy, by making substantial allegations of class-wide discrimination,

that is, detailed allegations supported by affidavits which successfully engage defendants' affidavits

to the contrary." (citing *Thiessen*, 267 F.3d at 1097).

Similarly, numerous district courts have considered the decertification issue in the context

of FLSA collective actions and have followed the recent trend of denying decertification by

emphasizing that "similarly situated," as contemplated by section 216(b), does not mean identically

situated.[5]

---

[5]*See, i.e., Riojas v. Seal Produce, Inc.*, 82 F.R.D. 613, 616 (S.D. Tex. 1979); *see also, Tucker v. Labor Leasing, Inc.*, 872 F.Supp. 941, 947 (M.D. Fla. 1994); *Ayers v. SGS Control Servs.*, 2007 WL 646326, at *18 (D.N.Y. Feb. 27, 2007) (The court denied decertification because "on balance, the differences among the plaintiffs do not outweigh the similarities in the practices to which they claim to have been subjected."); *Hayes v. Laroy Thomas, Inc.*, No. 5:05CV227 (E.D. Tex. Apr. 3, 2007), findings and conclusions adopted at *Hayes v. Laroy Thomas, Inc.*, 2007 WL 1174313 (E.D. Tex. Apr. 19, 2007) (Plaintiffs' claims are based on a uniform, systematically applied practice that allegedly violates the FLSA and presents common issues of law and fact arising from the same alleged activity.); *Wilks v. Pepboys*, 2006 WL 2821700 (M.D. Tenn. Sept. 26, 2006) (decertification denied in off-the-clock case with court noting: "given the plaintiffs' proffer of significant evidence supporting their contention that the defendant, despite its written policies, subjected them to impermissible time-keeping and overtime practices, the court finds that the plaintiffs have demonstrated their subjection to a common, impermissible practice in a manner that suffices to meet their burden at the decertification stage of the proceedings." *Id.* at *5); *Nerland v. Caribou Coffee Co., Inc.*, No. 05-1847 (D. Minn. Apr. 6, 2007), findings and conclusions adopted at *Nerland v. Caribou Coffee Co., Inc.*, No. 05-1847 (D. Minn. May 17, 2007) (decertification denied because: 1) there was a uniform written job description applicable to all store managers; 2) the evidence showed most managers worked overtime; and 3) defendant had made the decision to classify managers as exempt as a group, rather than making individual determinations of how each should be classified); *Frank v. Gold'n Plump Poultry, Inc.*, 2007 WL 2780504 (D. Minn. Sept. 24, 2007) (decertification denied); *Orvis v. Triple Ace Investments, LLC*, 2007 WL 1625763 (M.D. Fla. June 5, 2007) (decertification denied); *Bradford v. Bed Bath & Beyond*, 184 F. Supp. 2d 1342 (N.D. Ga. 2002) (decertification denied because "the only determinative issue is whether Plaintiffs' job

Perhaps most importantly, in *Pendlebury v. Starbucks Coffee Co.*, No. 04-80521 (S.D. Fla. September 21, 2007), the district court denied Defendant's attempt to decertify a class of store managers seeking to recover overtime compensation under the FLSA. Just as in this case, Starbucks emphasized in *Pendlebury* the many alleged differences among the class participants, including the extent to which they were supervised by their district managers, the varying perceptions on how much claimants contributed to their store's success, different management styles, etc. The court found Defendant's argument disingenuous, noting:

- All of the stores are "generally set up similarly." (*Id.* at 8.)

- All of the employees—baristas, shift supervisors, assistant managers, and store managers—share similar skills, functions and working conditions. (*Id.* at 9.)

- The job description for the store manager position is created at Defendant's central headquarters in Seattle, and is consistent throughout the company; the job description is the same for all store managers. (*Id.*)

- The store manager's duties and responsibilities are consistent throughout the organization. (*Id.*)

- Defendant's policy and practice of classifying all store managers (except in California) as exempt comes from its headquarters in Seattle. (*Id.* at 10.)

For the same reasons, Defendant's attempt to divorce itself from the impact resulting from its national reclassification of ASMs should fail. Accordingly, Defendant's Motion should be denied.

---

duties were similar"); and *Rawls v. Augustine Home Health Care, Inc.*, 2007 WL 1952988 (D. Md. July 5, 2007) (decertification denied).

## VII. PLAINTIFFS ARE SIMILARLY SITUATED

### A.     Plaintiffs' Employment Setting Demonstrates That They Are Similarly Situated

The first consideration in determining whether Plaintiffs are similarly situated is whether the factual and employment settings of the individual Plaintiffs are disparate. *Mooney*, 54 F.3d at 1213 n.7. Under this factor, courts look at considerations such as the job duties, geographical location, supervision, and pay provisions of the Plaintiffs. *Moss v. Crawford & Co.*, 201 F.R.D. 398, 409 (W.D. Pa. 2000).

Here, as in *Pendlebury*, the evidence is overwhelming that Plaintiffs had similar employment settings. Namely, all of the Plaintiffs are former ASMs. Thus, they share the same job title. Next, Defendant's headquarters in Seattle promulgated only one job description for ASMs. Therefore, the scope of their job description and duties is identical. Similarly, Defendant trained ASMs and measured their performance using a single set of criteria. Accordingly, the opportunity for advancement was measured using the exact same factors. Finally, Defendant classified all ASMs as non-exempt.

### 1.     ASM Job Duties Were the Same Nationwide

Not only did Defendant have a single 'job description' for ASMs, the evidence reveals that ASMs actually performed the same types of job duties in their daily affairs.[6]

---

[6]**They ordered product and supplies.** (Falcon Tr. at 36:25, 37:1, 43:4-7, 67:22-25; Brantley Tr. at 29:7-8; Chizmadia Tr. at 23:14-24, 24:10-14; Crociani Tr. at 25:10-16; Good Tr. at 68:11-12; Huffman Tr. at 163:15-17; Lambert Tr. at 28:22-25; Masse Tr. at 39:8-13, 19-21; McCutchan Tr. at 50:21-22; Olson-Young Tr. at 56:10, 67:22-25, 74:3-6; Spear Tr. at 63:22, 64:1-2; Johnston Tr. at 84:12-14.) **They prepared store schedules.** (Falcon Tr. at 37:14, 37:22, 43:13-14; Bejarano Tr. at 12:19-22; Carpenter Tr. at 106:5-7; Chizmadia Tr. at 22:8-15, 23:15-24; Crociani Tr. at 25:10-16; Good Tr. at 66:19-25, 67:1-11; Huffman Tr. at 82:13-21; Lambert Tr. at 31:9-10; Masse Tr. at 37:4-17, 39:8-13; McCutchan Tr. at 51:8-9; Olson-Young Tr. at 56:20-23, 57:6-9, 67:22-25, 74:15-18; Spear Tr. at 40:16-18.). **They conducted interviews of candidates for employment.** (Falcon Tr. at 40:22; Bejarano Tr. at 14:19-22; Brantley Tr. at 30:18; Carpenter Tr. at 102:19-20, 104:2-9;

### 2. ASMs Worked Off the Clock

When Plaintiffs did not have enough time to complete the foregoing duties in 40 hours or less,

they performed these duties off the clock.[7]

The foregoing off the clock duties further illustrate that Plaintiffs are similarly situated. *See*

*Hill v. Muscogee County Sch. Dist.*, 2005 WL 3526669 (M.D. Ga. Dec. 20, 2005) (holding that

defendant's focus on the specific tasks resulting in overtime was "too narrow," and that the duties

---

Chizmadia Tr. at 24:15-16; Crociani Tr. at 25:10-16; Dvir Tr. at 64:16-22; Good Tr. at 69:20-25, 70:1; McCutchan Tr. at 58:2-9, 16-25; 59:1; Olson-Young Tr. at 67:22-25, 68:1, 76:5-6; Spear Tr. at 58:2-8; Johnston Tr. at 84:16.) **Plaintiffs disciplined partners.** (Brantley Tr. at 32:10-13; Chizmadia Tr. at 24:20-24; Dvir Tr. at 65:7-14; Good Tr. at 71:22-24; Huffman Tr. at 163:9-11; Masse Tr. at 37:4-20; McCutchan Tr. at 60:10-14; Olson-Young Tr. at 70:5-11; and Spear Tr. at 45:15-18.) **They prepared performance evaluations of partners.** (Falcon Tr. at 42:18-19; Crociani Tr. at 25:10-16; Good Tr. at 70:21-23; Huffman Tr. at 164:20-22, 165:1-4; Masse Tr. at 39:8-13; Olson-Young Tr. at 71:10-17; Spear Tr. at 42:18-22; 43:1.) **They processed payroll.** (Carpenter Tr. at 106:8-9; Chizmadia Tr. at 107:6-17; Crociani Tr. at 25:10-16; Good Tr. at 69:11-13; McCutchan Tr. at 57:8-11; Spear Tr. at 69:16-18.) **They put away orders and deliveries.** (Falcon Tr. at 60:6-20, 81:20-25, 82:1; Brantley Tr. at 46:20-24; Chizmadia Tr. at 23:15-24; Crociani Tr. at 82:4-11; Huffman Tr. at 97:8-15; Kooyenga-Honaker Tr. at 56:9-12; McCutchan Tr. at 60:23-24.) **They made deposits at a local bank.** (Falcon Tr. at 68:19-21; Dvir Tr. at 64:2-4; Masse Tr. at 56:1-4; Olson-Young Tr. at 57:6-9; Bejarano Tr. at 39:21-25; Carpenter Tr. at 69:3, 121:21-25, 122:1-3; Crociani Tr. at 103:3-6; Good Tr. at 133:1-17, 152:19-20, 155:2-6; McCutchan Tr. at 101:1-3; Spear: 96:4-5, 119:21-22, 120:1-4.) **Plaintiffs also delegated tasks** (Falcon Tr. at 51:5-12; Brantley Tr. at 95:11-13; Chizmadia Tr. at 58:14-18; Dvir Tr. at 118:6-14; Good Tr. at 86:4-7; 125:5-10; McCutchan Tr. at 57:1-7) **and trained and coached other partners** (Chizmadia Tr. at 23:15-24; McCutchan Tr. at 60:15-17; Olson-Young Tr. at 67:22-25; Spear Tr. at 78:19-22; Johnston Tr. at 84:12-18), **among other duties.**

[7]Falcon Tr. at 60:6-20, 81:20-25:82-1; Bejarano Tr. at 46:20-24; Brantley Tr. at 69:15-24; Chizmadia Tr. at 116:15-25, 119:16-22, 125:19-25; Crociani Tr. at 82:4-11; Huffman Tr. at 97:8-15; Kooyenga-Honaker Tr. at 56:9-12 (Plaintiffs put away orders and deliveries off the clock); Falcon Tr. at 81:20-25, 82:1; Chizmadia Tr. at 97:10-15, 119:16-22, 123:2-8, 132:24-25, 133:1-10; Huffman Tr. at 82:13-21; McCutchan Tr. at 186:3-13; Olson-Young Tr. at 121:12-22; Copeland Decl. at ¶7; Binder Decl. at ¶ 5; Moore Decl. at ¶ 5 (Plaintiffs prepared store schedule off the clock); Bejarano Tr. at 39:21-25, 40:1-3; Carpenter Tr. at 69:3, 121:21-25, 122:1-3; Crociani Tr. at 103:3-6; Good Tr. at 133:1-17, 152:19-20, 155:2-6; Masse Tr. 58:13-21; McCutchan Tr. at 97:7-15, 101:1-3; Spear Tr. at 96:4-5, 119:21-22, 120:1-14; Aviles Decl. at ¶ 5; Carmany Decl. at ¶ 7; (Plaintiffs made bank deposits off the clock).

16

for which plaintiffs were not paid were consistent with plaintiffs' normal job duties, thereby rendering plaintiffs similarly situated).

Moreover, it is undisputed that Defendant had one job description for all ASMs throughout the United States. (Chrispell Tr. at 246: 20-25; Dawson Tr. at 117:9-16; *see also* Copeland Decl. at ¶ 9; Aviles Decl. at ¶ 8; Carmany Decl. at ¶ 10; Binder Decl. at ¶ 8; Moore Decl. at ¶ 8).

### 3.    ASMs Were Subject to the Same Supervision

As demonstrated above, each store had a similar complement of partners—all of whom were supervised by a SM. After the reclassification in October 2002, the SM retained 'ownership' of all store operations. ASMs reported to, and worked under the direction and control of, the SM. Accordingly, their line of reporting and supervision was the same across the country.

### 4.    ASMs Were Subject to the Same Pay Provisions

It is undisputed that, prior to the reclassification, ASMs were paid an annual salary and were not entitled to overtime compensation. After the reclassification, it is further unquestioned that Defendant, as a national policy, was supposed to pay ASMs a base salary plus overtime. Romano Tr. At 90:10-18. Indeed, Defendant has throughout this litigation emphasized its stated policy of "time worked equals time paid." As Plaintiffs have confirmed that each worked off the clock, Plaintiffs should be paid.

### B.    The Defenses Alleged by Defendants Are Not Individualized and Are Without Merit

### 1.    Defendant Has Alleged No Individualized Defenses Against Plaintiffs

In only 2 pages of briefing, Defendant asserts a few defenses to Plaintiffs' claims, erroneously characterizing them as "individualized," and suggesting they weigh in favor of decertifying the case. Specifically, Defendant raises 3 alleged defenses: 1) lack of employer knowledge; 2) the doctrine of *de minimis* overtime; and 3) the alleged voluntariness of a portion of

17

the Plaintiffs' overtime work. Defendant's arguments in this regard fail as a matter of law, and Defendant's Motion on this ground should be denied.

As an initial matter, simply alleging a number of individualized defenses is not enough to support a decision to decertify. *See Hyman v. First Union Corp.*, 982 F.Supp. 1, 6 (D.D.C. 1997) ("The existence of asserted separate defenses with respect to each Plaintiff does not automatically eliminate §16(b) joinder); *Thiessen*, 267 F.3d at 1107 (concluding that "the presence of 'highly individualized' defenses clearly did not, as the district court concluded, outweigh 'any potential benefits in proceeding as a collective action.'").

### a. Management Knowledge

With respect to the alleged lack of management knowledge of overtime worked, Defendant misstates the law and the evidence. First, the Fifth Circuit follows the rule that an employer cannot shield itself from liability under the FLSA by burying its head in the sand and not attempting through diligence to determine whether its employees are working off the clock. *See Martinez v. Food City, Inc.*, 658 F.2d 369, 375 (5th Cir.1981) (citing *Brennan v. General Motors Acceptance Corp.*, 482 F.2d 825 (5th Cir. 1973)). As in this case, the employers in *Martinez* and *Brennan* argued that they had limited or no knowledge of unreported overtime, relied on employees to report their hours fully, and promulgated memoranda to encourage full reporting. *Id.* Observing that the immediate supervisors may have had actual knowledge of uncompensated overtime, and that a reasonably diligent employer could have acquired knowledge of the violations of the FLSA, the *Martinez* and *Brennan* courts held the employers had, at a minimum, constructive knowledge of the violations. Based upon the evidence presented below, the same application should be found here. *See also Goldberg v. Kickapoo Prairie Broad.*, 288 F.2d 778 (8th Cir. 1961).

18

Indeed, in the case at bar, and contrary to the misstatements made by Defendant, Starbucks had actual knowledge of the overtime worked by Plaintiffs. For example, Falcon testified that his SM witnessed him working off the clock. (Falcon Tr. at 82:4-24, 83:23-25, 84:1-2; *see also,* Dvir Tr. at 156:2-25, 157:1-2; Fernandez Tr. at 54:22-25, 69:4-7; Good Tr. at 152:24-25, 153:1-17, 178:12-22; Huffman Tr. at 74:17-22, 75:1, 101:13-20; McCutchan Tr. at 102:7-25; 103:1-2; Olson-Young Tr. at 165:3-6; 167:4-6.) A number of Plaintiffs' District Managers were also aware that ASMs were working off the clock. (Falcon Tr. at 104:3-8; Brantley Tr. at 79:19-24; Crociani Tr. at 58:5-15; Dvir Tr. at 74:16-22; Good Tr. at 94:9-25, 95:1-13, 152:24-25, 153:1-17; Spear Tr. at 117:19-22, 118:1-13.) Simply put, Defendant's argument that there may have been a varying degree of knowledge by management is immaterial under this "knew or should have known" analysis.

Defendant argues that it is shielded from liability because its "time worked equals time paid" policy meant that employees were required to report all hours worked. (*See* Defendant's Motion at 7-9). This is simply not a valid defense. "The mere promulgation of a rule against [working "off the clock"] . . . is not enough." *Clark v. Dollar Gen. Corp.*, 2001 WL 878887, at *4 (M.D. Tenn. May 23, 2001). It is the duty of employers to control employees' work time so that if it does not want the work to be performed, it must stop if from being performed. The Department of Labor's regulations are explicit regarding an employer's duty to control employees' work hours:

### § 785.13 Duty of Management

> In all such cases it is the duty of the management to exercise its control and see that the work is not performed if it does not want it to be performed. It cannot sit back and accept the benefits without compensating for them. *The mere promulgation of a rule against such work is not enough.* Management has the power to enforce the rule and must make every effort to do so.

19

29 C.F.R. § 785.13 (emphasis added). "Any employer 'who is armed with knowledge that an employee may be working overtime cannot stand idly by and allow an employee to perform overtime work without proper compensation' even if the employee does not make a claim for overtime compensation.'" *Cunningham v. Gibson Elec. Co., Inc.*, 43 F.Supp.2d 965, 975 (N.D. Ill. 1999) (quoting *Newton v. City of Henderson*, 47 F.3d 746, 748 (5th Cir. 1995)).

The courts have had no difficulty applying these principles to reject employers' attempts to defend against the failure to pay overtime by claiming that employees did not fill out the proper time records, or that they violated an employer's rule or agreement with the employer against working overtime. For example, in *Burry v. National Trailer Convoy, Inc.*, 338 F.2d 422, 426 (6th Cir. 1964), the employer unsuccessfully argued that the employees could not recover unpaid overtime because their written contract prohibited them from working over 40 hours a week without the employer's written consent and because their time sheets showed 40 hours.

Defendant argues that mini-trials will be necessary to evaluate whether work performed by Plaintiffs off the clock is compensable. Whether the activities in which Plaintiffs engaged constituted compensable work, and whether Defendant was aware Plaintiffs were working off the clock, are not defenses as much as they are challenges to Plaintiffs' proof. Ultimately, an employer is liable for work performed by its employees, whether it has actual or constructive knowledge that the work is performed. *See Brennan*, 482 F.2d at 827; *Dept. of Conservation and Natural Resources*, 28 F.3d at 1082 (quoting *Gulf King Shrimp Co. v. Wirtz*, 407 F.2d 508, 512 (5th Cir. 1969)).

Moreover, Defendant's own records reveal that complaints of 'off the clock' work were pervasive. *(See, e.g.,* Complaints concerning ASMs working off the clock (attached as Ex. 25 to Decl. of Robert R. Debes, Jr.).)

20

Similarly, internal memo prepared September 2005 - 3 years after the reclassification - ASMs from around the country were still confused over what they were supposed to be doing and how their role changed, if at all, following reclassification. (*See, i.e.*, Internal Memorandum regarding ASM duties (attached as Ex. 26 to Decl. of Robert R. Debes, Jr.)).

### b. *De Minimis*

The doctrine that *"de minimis* overtime" should not be compensated does not apply to the case at bar. The *de minimis* rule provides that an employer, in recording working time, may disregard "insubstantial or insignificant periods of time beyond the scheduled working hours, which cannot as a practical administrative matter be precisely recorded for payroll purposes." *Mireles v. Frio Foods, Inc.*, 899 F.2d 1407 (5th Cir. 1990) (citing 29 C.F.R. § 785.47). As the Defendant well knows, the *de minimis* rule applies only where the time involved is of a few seconds or minutes duration, and where the failure to count such time is due to . . . industrial realities. *Id.* An employer may not arbitrarily fail to count as hours worked any part, however small, of the employee's fixed or regular working time or practically ascertainable period of time he is regularly required to spend on duties assigned to him as part of his job. *Id.* Setting aside the fact that Defendant has misstated several Plaintiffs' testimony, its suggestion that the *de minimis* rule applies herein raises serious concern and doubt about its defenses in general.

Finally, no Plaintiff seeks only a few seconds or even a few minutes of overtime pay. All Plaintiffs deposed testified that they worked, and are entitled to be compensated, for hours of work off the clock per week. (Falcon Tr. at 60:6-20, 81:20-25, 82:1, 116:9-16, 227:2-9, 227:17-25, 228:1-4; Brantley Tr. at 67:12-16, 88:2-25; Carpenter Tr. at 78:12-15; Chizmadia Tr. at 116:12-14, 119:13-15, 122:17-23; Crociani Tr. at 81:1-11; Dvir Tr. at 29:2-10, 88:15-25, 89:1-4, 91:9-25; Fernandez Tr. at 57:21-23, 65:24-25, 66:1-5, 77:18-25; Good Tr. at 98:5-13, 132:21-25, 156:19-25, 157:1-6;

21

Huffman Tr. at 71:20-22, 185:4-22, 186:1-10; Kooyenga-Honaker Tr. at 35:21-25; Lambert Tr. at 44:3-5; Masse Tr. at 45:14-25, 46:1; McCutchan Tr. at 96:4-11, 97:7-15, 99:11-15).  Accordingly, Defendant's Motion should be denied on this ground.

### c. Voluntariness

Defendant's final attempt to persuade the Court to decertify the class arises in the context of various alleged "volunteer" events that employees were encouraged to attend if they wanted to advance within Starbucks.  Defendant contends that an entire class should be decertified because some opt-ins "differ as to whether they were under management pressure to attend these events." (*See* Defendant's Motion at 23.)  However, this is nothing more than a red herring.  As Defendant well knows, the law does not allow an employer to avoid paying overtime because an employee allegedly volunteered to work.  Indeed, Defendant cites the Court to not one case which holds to the contrary.

For example, there is no private exception to paying overtime as there is for public employees.  *See* 29 C.F.R. § 553.101(b).  An employer who relies on a statutory exception to the FLSA overtime obligations must shoulder a heavy burden to support its claim.  FLSA exemptions "are to be narrowly construed against the employer asserting them." *Johnson v. City of Columbia*, 949 F.2d 127, 129-30 (4th Cir.1991) (en banc).

In the case at bar, Defendant sponsors events, serves coffee at events, arranges for its employees to provide services at the events, and otherwise encourages its employees to participate in these so-called volunteer events.  However, as testified to by Plaintiffs, there is pressure to attend the events on behalf of the company in order to advance within the Starbucks culture.

22

In his deposition, Falcon testified that although he was aware that Defendant had a written policy prohibiting off-the-clock work, "once you got to the stores, it didn't seem that way at all. It was like this is the idea but not the reality." (Falcon Tr. at 61:21-25, 63:1-13.) Opt-in Plaintiff Matthew Good echoed this sentiment, testifying that the "time worked equals time paid policy" was "on paper and it was what we talked about, but it wasn't attainable." (Good Tr. at 99:23-25, 100: 1-19.) Sara Olson-Young testified: "That was the best practice in stores, at all stores I have been to, that I've worked in: That even though Defendant's standards are time worked equals time paid, in-store and your dedication, your policy in-store, that wasn't how it was." (Olson-Young Tr. at 91:17-22; *see also* Brantley Tr. at 54:15-20; Masse Tr. at 44:19-25; Johnston Tr. at 63:15-18, 64:20-22, 65:1-2.)

Indeed, the sheer impossibility of accomplishing all of the duties/tasks that Defendant required of ASMs in 40 hours or less per week led Plaintiffs to work off the clock. Opt-in plaintiff Todd Lambert explained:

> So when we'd go to our training and things, you'd be told '[t]ime worked equals time paid' and you'd be told . . . these were our mottos . . . but when you actually got to the stores, it was different. There was a different feel, where we all knew what that stuff was; we'd all been trained and this was the way it was supposed to go; but there was this -- also this feeling of: Well, that's Starbucks in a perfect world, but every day is not a perfect world at Starbucks so we do what we have to do. . . . [W]hen you're being trained, you're trained one thing and everybody buys into that; but once we're on the store level and you're trying day by day to run this store, it's not often optimal. And so you kind of learn to just – yes, those are the rules, but this is what we're doing so that we can make it through today.

(Lambert Tr. at 130:14-24, 131:4-10).[8]

_____

[8]*See also* Brantley Tr. at 42:16-18 (store manager informed opt-in plaintiff Michael Brantley that "[t]ime worked is time paid, but at the same time we've got to get things done around here"); Crociani Tr. at 94:22-25, 95:1-2, 95:24-25, 96:1-4, 96:15-17 (store

It was this practice of Defendant that resulted in Plaintiffs working off the clock, and it is this practice that binds Plaintiffs to one another and warrants continuation of this case as a collective action.[9] *See Wilks v. Pepboys*, 2006 WL 2821700, at *5 ("Given the plaintiffs' proffer of significant evidence supporting their contention that the defendant, despite its written policies, subjected them to impermissible time-keeping and overtime practices, the court finds that the plaintiffs have demonstrated their subjection to a common, impermissible practice in a manner that suffices to meet their burden at this decertification stage of the proceedings").

## C. Fairness and Procedural Considerations Support Moving Forward With the Collective Action

### 1. Considerations of Fairness Support Maintaining This Collective Action

The FLSA is a remedial statute. *Posner v. Showroom Inc.*, 762 F.2d 1010 (6th Cir. 1985).

---

managers and ASMs "did a lot of working off the clock because there was so much work to be done"); Huffman Tr. at 117:16-21 ("40 hours was never enough time to get my specific jobs done in a week"); Lambert Tr. at 45:20-25 (noting difficulty of getting everything done in the allotted time); Chizmadia Tr. at 141:13-20 (opt-in plaintiff Daniel Chizmadia complained to his district manager that he had too many things to get done within a 40-hour week); Carpenter Tr. at 196:22-25, 197:1-25, 198:1-8 (describing "insurmountable pressure" for ASMs to complete all duties); Olson-Young Tr. at 124:3-9 (worked off the clock to complete duties); Johnston Tr. at 95:3-10 ("[Y]ou couldn't physically get everything done in 40 hours and not incur overtime. It's like you can't be in two places at once. You just couldn't do it."); Aviles Decl. at ¶ 4; Carmany Decl. at ¶ 6; Binder Decl. at ¶ 4; Moore Decl. at ¶ 6; Copeland Decl. at ¶ 6 (noting it was almost "impossible" for ASMs to complete all duties in a 40-hour week).)

[9] In addition to allowing ASMs to work off the clock routinely, Defendant has a history of allowing other non-exempt partners, including Baristas and Shift Supervisors, to work off the clock. (*See* Falcon Tr. at 57:24-25; 58:1-9, 23-25; 59:1-4, 10-25; Brantley Tr. at 86:15-25; 87:1-21; 88:21-25; Fernandez Tr. at 61:3-13; Good Tr. at 130:7-23; 131:3-16; 152:24-25; 153:1-17; 168:11-12; Huffman Tr. at 46:18-22; 47:1-22; 48:1-22; 49:1-22; 50:1-4; 69:16-22; 70:1-8; 110:15-18; Lambert Tr. at 96:9-12; Masse Tr. at 19:21-25; 20:1-3; 21:1-7; McCutchan Tr. at 96:4-11; 119:5-11; Olson Tr. at 37:6-15; 38:15-25; 93:13-16; Johnston Tr. at 24:10-16.)

> The Fair Labor Standards Act of 1938 was enacted by Congress to be a broadly remedial and humanitarian statute. The Act was designed to correct "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers . . ."

*Donovan v. Brandel*, 736 F.2d 1114, 1116 (6th Cir. 1984) (quoting from *Dunlop v. Carriage Carpet Co.*, 548 F.2d 139, 143-45 (6th Cir. 1977).

Furthermore, the Court must "consider whether certification would serve the purposes and putative benefits of a collective action under § 216. *Vaszlavik v. Storage Tech. Corp.*, 175 F.R.D. 672, 678 (D. Colo. 1997). In *Hoffman-LaRoche, Inc.*, 493 U.S. 165, 170 (1989), the Supreme Court clearly articulated that purpose: "A collective action allows . . . Plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources. The judicial system benefits by efficient resolution in one proceeding of common issue of law and fact arising from the same alleged . . . activity." Taken together, these purposes weigh heavily against Defendant's motion to decertify the class and dismiss the opt-in Plaintiffs to pursue their claims independently. *See, Rodolico v. Unisys Corp.*, 199 F.R.D. 468, 484 (E.D.N.Y. 2001) (mindful of the broad remedial purposes of the ADEA, as well as the fact that the "similarly situated" requirement of section 216(b) does not compel the Plaintiffs to meet the predominance prerequisite of Rule 23(b)(3), the Court has viewed the picture painted by the Plaintiffs as a whole and finds that a collective action is appropriate for the liability phase of the Plaintiffs' claim.").

## 2. The Court Has the Necessary Means to Ensure a Manageable Trial

Plaintiffs have established that individual Plaintiffs are similarly situated. However, to the extent that the Court is concerned about managing this case, it has procedural tools at its disposal to make the case more manageable such as the use of representative testimony, bifurcation, and the creation of subclasses.

### a.   Representative Testimony

It is well settled that not all affected employees must testify in order to prove violations or to recoup back wages.   Rather, in most cases, courts have allowed Plaintiffs to rely on representative testimony.   *See Brennan*, 482 F.2d at 829; *Secretary of Labor v. DeSisto*, 929 F.2d 789, 792 (1st Cir. 191); *Reich v. Gateway Press*, 13 F.3d 685, 701 (3rd Cir. 1994); *Donovan v. Williams Oil Co.*, 717 F.2d 503, 505-06 (10th Cir. 1983).   When considering how to appropriately manage an FLSA case, the questions are when, and in what way, is representative testimony appropriate.   Plaintiffs propose trying this case as a collective action, with representative testimony, on several issues that relate to the bulk of claims.   Plaintiffs' proposal is the only way in which this Court could reasonably effect justice for all the parties involved.

Defendant argues that collective actions are inappropriate where each Plaintiff's claims will require individualized determinations, that due process requires that Defendant have the opportunity to defend itself against so-called individual claims, and that the need for mini-trials rules out collective treatment for Plaintiffs.   The notion that no representative testimony should be allowed in this action is out of step with the reality of the facts of this case, the necessities of trying an FLSA case, and the weight of authority on the subject.

The reality is that any large FLSA case, where identifiable practices or patterns exist, should be tried with representative testimony to conserve judicial resources.   *See, e.g., National Electro-Cotings, Inc. v. Brock*, 1988 U.S. Dist. LEXIS 16937 (N.D. Ohio) (courts have consistently allowed, or even required, a small number of employees to testify to establish a pattern of violations for a larger number of workers); *Donovan v. Bel-Loc Diner, Inc.*, 780 F.2d 1113, 1116 (4th Cir. 1985) (noting that "[c]ourts have frequently granted back wages under the FLSA to non-testifying employees based upon the representative testimony of a small percentage of the employees" and that

26

testimony need only "be fairly representational"); *see also Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 690-91 (testimony of 8 of approximately 300 employees, or 2.7% of group, sufficient to establish entitlement to recovery under the FLSA).

**b.    Bifurcation**

In addition, Federal Rule of Civil Procedure 42(b), "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy," may order separate trials of any claims or of any separate issues. If it becomes clear to the court that bifurcation of the liability from damages issues would further judicial economy, that tool is certainly at its disposal. *See Myers v. Copper Cellar Corp.*, 1996 U.S. Dist LEXIS 20509 at *3 (E.D. Tenn. 1996) ("It may very well develop . . . that bifurcation of the liability from damage issues may be appropriate, but it does not appear in the interest of judicial economy or of justice at this state of the proceeding to bifurcate the trial. . . .").

**c.    Subclasses**

Furthermore, the Court may find it expeditious to create a separate subclass for any distinct groups that it foresees raising separate issues at the liability or damages stages of the trial. *See In re Delta Air Lines*, 310 F.3d 953, 956 (6th Cir. 2002) (district court certified undesignated subclasses); *Roman v. Korson*, 152 F.R.D. 101, 109 (W.D. Mich. 1996) (considering Plaintiff subclasses).

In sum, this Court has at its disposal all the necessary procedural tools to ensure the trial of this collective action proceeds in both a fair and manageable manner.

## VIII. CONCLUSION

Plaintiffs have met their burden to show that they are similarly situated, and that they were the victims of a unified practice that necessitated that they and other ASMs work off the clock in order to complete their duties.  Therefore, Plaintiffs ask that the Court deny Defendant's Motion.

Respectfully submitted,

Martin A. Shellist
State Bar No. 00786487
Federal ID No. 16456
Daryl J. Sinkule
State Bar No. 24037502
Federal ID No. 34842
SHELLIST ✦ LAZARZ LLP
3D/International Tower
1900 West Loop South, Suite 1910
Houston, Texas 77027
Telephone: (713) 621-2277
Facsimile: (713) 621-0993

Robert R. Debes, Jr.
State Bar No. 05626150
Federal ID No. 12308
DEBES LAW FIRM
17 South Briar Hollow Lane, Suite 302
Houston, Texas 77027
Telephone: (713) 623-0900
Facsimile: (713) 623-0951
**ATTORNEYS FOR PLAINTIFFS**

TYLER & DAS, P.C.
Micky N. Das
State Bar No. 05402300
Federal ID No. 10571
2000 Bering Drive, Suite 370
Houston, Texas 77057
Telephone: (713) 739-1900
Facsimile: (713) 739-8347

28

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument was forwarded by Notice of Electronic Filing on Known Filing Users, or via courier, certified mail (return receipt requested), facsimile transmittal, and/or first class mail delivery on unknown Filing Users, on this the 17th day of December, 2007, addressed as follows:

Fraser A. McAlpine
AKIN GUMP STRAUSS HAUER & FELD LLP
580 California Street, Suite 1500
San Francisco, California 94104-1036

Daniel L. Nash
Nathan J. Oleson
Kelly A. Smith
Jessica W. Paniccia
AKIN GUMP STRAUSS HAUER & FELD LLP
13333 New Hampshire Avenue N.W.
Washington, D.C. 20036

Robert R. Debes, Jr.
DEBES LAW FIRM
17 South Briar Hollow Lane, Suite 302
Houston, Texas 77027

Micky N. Das
TYLER & DAS
2000 Bering Drive, Suite 370
Houston, Texas 77057

MARTIN A. SHELLIST

29