**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **JAMES FALCON, on Behalf of Himself** | § | |
| **and Others Similarly Situated,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| **VS.** | § | **CIVIL ACTION NO. H-05-0792** |
| | § | |
| **STARBUCKS CORPORATION and** | § | |
| **Does 1 through 100,** | § | |
| | § | |
| **Defendants.** | § | |

**MEMORANDUM AND ORDER**

Pending before the Court is Defendants' Motion to Decertify Collective Action. For the reasons provided below, Defendants' motion, Docket No. 134, is **DENIED**.

**I.     PROCEDURAL HISTORY**

Plaintiff Falcon is a former Assistant Store Manager of Defendant Starbucks Corporation ("Starbucks"). In March 2005, Falcon filed a putative collective action on behalf of himself and others similarly situated pursuant to section 16(b) of the Fair Labor Standards Act (FLSA). 29 U.S.C. §216(b). In his Amended Complaint, (Doc. No. 23), Falcon alleged that Starbucks had failed to pay him and other Assistant Store Managers (ASMs) overtime wages for all hours worked in excess of forty hours per week as required by the FLSA. 29 U.S.C. § 207.

At the first step of the two-stage process used by most district courts to determine whether putative class members are similarly situated so that they may proceed collectively, *see, e.g., Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1213-14 (5th Cir. 1995); *Reyes v. Texas EZpawn*, L.P., No. V-3-128, 2007 WL 101808, at *2 (S.D. Tex. Jan. 8, 2007), the Court granted Plaintiff's Motion for Conditional Class Certification (Doc. No. 53) and declined to reconsider that decision (Doc. No. 61). Accordingly, Plaintiff sent notice to 11,000 putative class members,

1

informing "Assistant Store Managers who were employed by Starbucks at any time during the time period of January 3, 2003 and the present who were denied overtime compensation for hours worked in excess of forty (40) in a work week" of their right to participate in the lawsuit (Doc. No. 61.)  372 individuals opted to join the collective class; 17 of these opt-ins were dismissed by agreement of the parties for failure to participate in discovery, leaving 355 opt-in Plaintiffs.  The 355 opt-ins are current and former Starbucks employees who worked at stores in 30 states; the majority of the opt-ins worked in California.  By agreement of the parties, eighteen of the opt-ins were deposed; Defendants chose ten of the eighteen, and Plaintiffs chose eight. (Mtn. Decert. Hr'g 35, Dec. 28, 2007.)  Parties also deposed Starbucks corporate representatives including Christine Deputy, Vice President of Partner Resources for the Western Division, Amy Christensen, Regional Director of Operations, Cynthia Chrispell, Regional Vice President Western Division, Gretchen Frampton, Project Specialist, and Robert Dawson, Project Specialist.

Defendants now bring this Motion to Decertify, arguing that collective action treatment is inappropriate because Plaintiffs are not similarly situated, the defenses to Plaintiffs' claims are individualized, and litigating these claims as a single action would be unfair to Defendants and unmanageable at trial.

## II.    FACTUAL BACKGROUND

Defendant Starbucks operates more than 6,500 retail stores in the United States. (Mot. Decert. 4).  The stores are organized into geographic districts of eight to nine stores.  (Chrispell Tr. 40-60.)  Each district is managed by a district manager, who reports to a regional director of operations; regional directors, in turn, report to a regional vice president, and the regional vice president reports to a division vice president.  (*Id.*)  Each store is staffed by "partners" including

entry level baristas, shift supervisors, assistant store managers, and store managers.  (*Id.* at 24.)
Not every store employs an ASM.  (*Id.*)

In October 2002, Starbucks reclassified all ASMs for purposes of the FLSA from
"exempt" to "non-exempt," making all ASMs throughout the country eligible for overtime.[1]
(Chrispell Tr. 318.)  Although Starbucks anticipated that ASMs would continue to work more
than 40 hours after  the reclassification (Chrispell Tr. 309-310), it did not increase store labor
budgets (Chrispell Tr. 394 (agreeing that store managers were "effectively told" after the
reclassification that "no matter how much work is done, now you still have to do it with the same
labor budget dollars you had before").)  Following the reclassification, ASMs were, by default,
scheduled for 40 hours a week.[2] (Chrispell Tr. 188, 316.)  After the reclassification, Starbucks
discouraged overtime.  (*See, e.g.*, Chrispell Tr. 188; Chizmadia Tr. 63-64, 112; Johnston Tr. 54-
57; Fernandez Tr. 60; Copeland Decl. Ex. 2, ¶ 4.)

As part of the reclassification, Starbucks issued a new job description for all ASMs that
became effective in October 2002.  (Chrispell Tr. 269-74; Frampton Tr. 25-27; Deputy Tr. 11-
12; Debes Ex. 23.)  To "roll out" the new job description to partners, a national team selected
facilitators to teach regional and district managers how to uniformly implement the description in
their territories.[3]  (Pls.' Resp. to Mot. Decert. 11).  Under the new job description, ASMs
continued to direct and monitor other partners while "on the floor," assist subordinate partners in
serving customers, and lead and assist them in the performance of operational tasks such as
cleaning, stocking, and cash management. (Mot. Decert 5.)  To the extent that ASMs performed
baristas tasks such as preparing drinks, they were allowed to delegate those tasks to subordinate

---

[1] FLSA requires employers to pay non-exempt employees at least time and a half for all hours worked over forty per
week.  29 U.S.C. §207.
[2] In some stores, ASMs were scheduled for slightly fewer hours (*See, e.g.*, Dvir, Tr. at 105 (stating that she was
regularly scheduled for 37.5 hours per week))
[3] The Starbucks team created a Faciliator's Guide for this purpose.  (Debes Ex. 24.)

employees.[4]  (Mot. Decert. 5-6.)  Starbucks recognized, however, that ASMs might not be

comfortable with such delegation at first due to the company culture "that said we're all in this

together."  (Chrispell Tr. 292.)  The new job description made Store Managers accountable for

management functions (Chrispell Tr. 269), but Store Managers could still delegate managerial

functions to ASMs for purposes of training (Chrispell Tr. 270).  As one Starbucks Regional

Director of Operations explained, "[e]ssentially what changed is a store manager owns all of the

functions in a store.  An assistant manager can train in any of those areas."  (Christensen Tr. 44.)

Although there were no specific duties that ASMs could not perform pursuant to the new job

description that they had been allowed to perform under the old description, "they wouldn't be

doing them as sole owner of those job responsibilities.  They would be doing them for a period

of time and then move on to the next one . . . ."  (Christensen Tr. 56.)   Although the job

description did not contain any time limitations, Store Managers were not supposed to

permanently delegate managerial tasks such as preparing schedules, inventory control, and

payroll.  (Frampton Tr. 78-84; Chrispell Tr. 269-74.)  As of September 2005, however, there was

still "confusion as to what the assistant store manager (ASM) role can and cannot do."[5]

(Internal Mem., Debes Ex. 26.)

Starbucks had an official written policy of prohibiting off-the-clock work.  (*see* New Hire

Paperwork, Oleson Ex. 22 at 25 ("Working 'off the clock' is strictly prohibited.").) The "time

worked is time paid" policy is stated clearly in the company's Partner Resources Manual (Oleson

Ex. 21 at 3.6).  The Manual also requires partners to report any violation of the prohibition

against off-the-clock work and states that managers who violate the policy will be subject to

---

[4] Starbucks explains that  such delegation would allow ASMs more time to work on management issues and notes that baristas and shift supervisors are generally part-time employees who receive lower pay, and thus are less likely to incur overtime.  (*See* Mot. Decert 6; Chrispell Tr. 298.)

[5] This finding was made after visits and interviews with more than 100 store and field management partners.  (Debes Ex. 26.)

corrective action "up to and including termination of employment."  (Partner Resources Manual, Oleson Ex. 21 at 3.7.)  Partners who fail to report off-the-clock work are also officially subject to corrective action.  (*Id.*)  ASMs were trained on the "time worked is time paid" policy.  (*See, e.g.*, Kooyenga Tr. 29-30; Crociani Tr. 195-96.)  ASMs were required to record their work by punching in and out for shifts and breaks and were officially allowed to note any unrecorded work in a "punch communication log."  (*See, e.g.*, Partner Resources Manual at 3.7; Olson Tr. at 85.)  Store Managers were to make corrections from the log into the payroll system.  Starbucks also provided all partners with a toll-free "Standards of Business Conduct Helpline" that allowed partners to "ask questions or report concerns," and assures partners that Starbucks "does not tolerate retaliation."[6]  (Standards of Business Conduct, Oleson Ex. 23 ("We are also counting on you to let us know if you see or learn something that suggests the Standards or the law have been violated.").)  There is evidence that Starbucks took corrective action when partners complained that managers had manipulated time records or did not credit employees for time worked.  (*See, e.g.*, Falcon Tr. 27-28, 157-161; Masse Tr. 93-94; Debes Ex. 25.)

Plaintiffs allege that despite the official "time worked is time paid" policy, Starbucks managers enforced an unwritten policy of encouraging or allowing ASMs to work off the clock in order to control overtime costs.  (*See, e.g.*, Falcon Tr. 62 (stating that prohibition against off-the-clock work was "the idea but not the reality"); Carpenter Tr. 70 (stating that written policy was not enforced); Lambert Tr. 41 ("it felt as if there was . . . a wink after that.  Time worked equals time paid—'wink'—we all know that."); Masse Tr. 38-39 (claiming that "time worked is time paid policy" was not enforced in stores); Johnston Tr. 65 ("The policy may have been one thing on paper, but the policy in practice was completely polar opposite of the paper."); Olson Tr. 91 ("That was the best practice . . . at all stores . . . that I've worked in: That even though

---

[6] Some opt-ins expressed concerns about the anonymity of the help line.  (*See, e.g.*, McCutchen Tr. at 42.)

Starbucks' standards are time worked equaled time paid . . . that wasn't how it was."); Brantley

Tr. 54 (saying he understood time worked is time paid on paper but the store manager "said

things still have to be done."); Lambert Tr. 130 ([Y]ou'd be told 'Time worked equals time paid'

. . . and that those were our mottos . . . but when you actually got to the stores, it was different. . .

. [T]hat's Starbucks in a perfect world, but every day is not a perfect world at Starbucks and so

we do what we have to do.").)  Despite the new job description, Plaintiffs contend they were

unable to properly complete all of their job duties in the 40 hours.  (*See, e.g.*, Huffman Tr. 117

("40 hours was never enough time to get my specific jobs done in a week."); Johnston Tr. 95

("[Y]ou couldn't physically get everything done in 40 hours . . . .  It's like you can't be in two

places at once.  You just couldn't do it."); Good Tr. 168-70 (stating that working off-the-clock

was "what it took to get the job done"); Falcon Tr. 209-10 ("I still felt that it was required of me

to work these hours, not just to . . . look good . . . but also just to get stuff in the store done that

wouldn't get done otherwise"); Chizmadia Tr. 116 (expressing frustration with District Manager

who "needed us to do what needed to be done" but "demanded we not work over 40 hours a

week.");  Olson Tr. 124 ("You did it however you possibly could to get it done"); Crociani Tr.

95-96 ("[I]t's hard to get everything done that Starbucks asks you to do . . . within a 40-hour

week."); Kooyenga Tr. 77-78 (discussing difficulties of completing work within 40 hours); Spear

Tr. 135-144 (stating that after the reclassification, she did not have less responsibility, it was just

"now you got in trouble . . . if you were there from 5:00 a.m. until 4:00 p.m."); Lambert at 45-48

(explaining that he would go over 40 hours because "it was very difficult and a lot of work to

close the store and get everything done in the time that was allotted"); Brantley Tr. 65-72

(discussing job duties that he did off the clock after store manager told him that overtime hours

were killing the budget); Carpenter Tr. 75-79 (explaining that she thought she could fulfill her

job duties in the time she was scheduled, but noting that "there were always outside influences."); Bejarano Tr.  28-29 (testifying that she worked off-the-clock "[b]ecause there were a thousand things to do and eight hours to do it in and it was expected of me to get them done"); Fernandez Tr. 60, 125 ("I wasn't able to get all my job duties done . . . in a 40-hour week.") Copeland Decl., Ex. 2, ¶6 ("It was next-to-impossible to accomplish all of the work that Starbucks required of me as an Assistant Store Manager without working over my scheduled 40 hours in a workweek."); Aviles Decl., Ex. 3, ¶ 4 ("It was oftentimes impossible to accomplish all the work that Starbucks required of me as an Assistant Store Manager without working over 40 hours in a workweek . . . .").) Plaintiffs maintain that when they were unable to complete their tasks in 40 hours, ASMs performed these duties off-the-clock instead of logging all of their overtime hours.  (*See, e.g., id.* McCutchan Tr. 185-86 (stating he usually could get his duties completed in 40 hours, but at least initially would do some work off-the-clock when he couldn't get duties done during the day); Fernandez Tr. 58, 143; Good Tr. 153-58; Bejarano Tr. 38; Carmany Decl., Ex. 4, ¶ 4 ("I regularly worked off the clock in an effort to complete all duties/tasks that Starbucks expected of me."), 7; Moore Decl., Ex. 6, ¶ 4 (stating that a District Manager "informed me . . . that 'the job needs to get done, regardless of how long it takes. Therefore, I would work off the clock to complete my expected duties/tasks"); Aviles Decl., Ex. 3, ¶ 4.)  Some opt-in Plaintiffs claim that  when they did try to log all overtime hours, their hours were "shaved" by store managers.  (*See*, *e.g.*, Spear Tr. 101-104, 105; Crociani Tr. 53-59; Dvir Tr. 113-115; Carmany Decl., Ex. 4, ¶ 5; Binder Decl., Ex. 5, ¶ 4.)  Plaintiffs claim that Store Managers either explicitly encouraged ASMs to perform this off-the-clock work or were aware that ASMs were performing such work and implicitly approved the practice by ignoring it. There is also some evidence that bonuses for Store Managers depended, in part, on the number of

labor hours the managers utilized, (*see, e.g.*, Masse Tr. 121-22), and that some ASMs believed that working off-the-clock would help them advance in the company, (*see, e.g.*, Falcon Tr. 57-60, 180; McCutchen Tr. 117-118), and that working overtime would negatively impact their bonuses (*see, e.g.*, Spear Tr. 138, 192; Carmany Decl., Ex. 4, ¶ 4.).

Defendants maintain that the opt-in Plaintiffs are not similarly situated because there is no nationwide policy requiring ASMs to work off the clock; instead, the only official nationwide policy clearly states that employees will be paid for all hours worked.  Defendants note that the deposed opt-ins did record and were paid for some overtime.  (*See, e.g.*, Opt-In Payroll Summaries, Oleson Ex. 24.)  Defendants also provide affidavits from 28 ASMs in the Houston Area who testify that they were not pressured to work off-the-clock in order to meet labor budgets or to complete their duties.  (*See* Doc. No. 146, Ex. 2-30.)  Defendants have not presented direct evidence from managers or other supervisors contradicting the opt-in Plaintiffs' specific claims of off-the-clock work or time shaving.

III.   **ANALYSIS**

Section 207 of the FLSA requires employers to pay all covered employees at least one and a half times their regular rate of pay for hours worked in excess of forty hours per week.  29 U.S.C. § 207(a)(1).  An employer that violates section 207 may be held liable for the unpaid overtime hours and "an additional equal amount as liquidated damages."  *Id.* at § 216(b).  An employer must compensate employees for all work it suffers or permits.  29 U.S.C. 203(g). Management has a duty to "exercise its control and see that the work is not performed if it does not want it to be performed.  It cannot sit back and accept the benefits without compensating for them."  29 C.F.R. § 785.13.

Section 216 of the FLSA provides that a person may maintain an action on "behalf of himself . . . and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought."[7] 29 U.S.C. § 216(b).  "A collective action allows  . . . plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources.  The judicial system benefits by efficient resolution in one proceeding of common issues of law and fact arising from the same alleged  . . . activity."  *Hoffman v. LaRoche*, 493 U.S. 165, 170 (1989); *see also Prickett v. DeKalb County*, 349 F.3d 1294, 1297 (11th Cir. 2003) ("Congress' purpose in authorizing §216(b) class actions was to avoid multiple lawsuits where numerous employees have allegedly been harmed by a claimed violation or violations of the FLSA by a particular employer.").

The Fifth Circuit has not specifically defined the term similarly situated, but it has upheld the use of a two-step *ad hoc* method for making this determination.  *See Mooney*, 54 F.3d at 1213 (refusing to specifically endorse a particular methodology for making a class certification decision under Section 216); *see also Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1105 (10th Cir. 2001); *Hipp v. Liberty Nat. Life. Ins. Co*, 252 F.3d 1208, 1219 (11th Cir. 2001).  This Court already allowed notice to be sent to potential class members under the "fairly lenient" step one standard.  *See Mooney*, 54 F.3d at 1214.  After discovery is largely completed, the Court at step two "makes a factual determination on the 'similarly situated' standard."  *Id.* The step two standard is "less 'lenient'" and at least one Circuit has concluded that the "similarities necessary to maintain a collective action under § 216(b) must extend 'beyond the mere facts of job duties and pay provisions."  *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 953 (11th

---

[7] Congress also incorporated section 216 of the FLSA into the Age Discrimination Employment Act, 29 U.S.C. § 626(b), and several of the cases cited in this opinion were brought under the ADEA.

Cir. 2007) (refusing to define "less lenient" and noting "the more material distinctions revealed by the evidence, the more likely the district court is to decertify the collective action" (citing *White v. Osmose, Inc.*, 204 F.Supp.2d 1309, 1314 (M.D. Ala. 2002)).  Courts have repeatedly stressed that Plaintiffs must only be similarly—not identically—situated to proceed collectively. *See, e.g.*, *Hipp*, 252 F.3d at 1217; *Reyes*, 2007 WL 101808, at *1; *Hill v. Muscogee County School Dist.*, 2005 WL 3526669, at *2  (M.D. Ga. 2005); *Basco v. Wal-Mart Stores, Inc.*, No. Civ. A. 00-3184, 2004 WL 1497709, at *5 (E.D. La. July 2, 2004); *Frank v. Capital Cities Communications, Inc.*, No. 80-CIV-2188-CSH, 1983 WL 643, at *2 (S.D.N.Y. Oct.11, 1983). The decision whether to decertify a collective action is within the district court's discretion.  *See, e.g.*, *Mooney* 54 F.3d at 1213 ("[T]he district court's application of the [legal] standard must be reviewed for abuse of discretion"); *Pendlebury v. Starbucks Coffee Co.*, 518 F. Supp. 2d 1345, 1348-49 (S.D. Fla. 2007).

At step two, courts generally consider the following factors when determining whether a lawsuit should proceed collectively: (1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations.  *See, e.g.*, *Mooney*, 54 F.3d at 1213 n. 7, 1215-16 (citing *Lusardi v. Xerox Corp.*, 118 F.R.D. 351, 352 (D.N.J. 1987)); *Thiessen*, 267 F.3d at 1105; *Anderson.*, 488 F.3d at 953; *Wilks v. Pep Boys*, No. 3:02-0837, 2006 WL 2821700, at *3 (Sept. 26, 2006); *Basco*, 2004 WL 1497709, at *4.

### A.      Disparate Factual and Employment Settings of Plaintiffs

In briefing, Plaintiffs contend that all putative class members were affected by Starbucks' common practice of pressuring or encouraging ASMs to work off-the-clock.  At a hearing on the pending motion, Plaintiffs also argued that collective treatment is appropriate because the

putative class members' "working situations" are similar.  (Mot. Decert. Hr'g Tr. 19, Dec. 28.

2007.)  Defendants, on the other hand, maintain that Plaintiffs' claims are inherently

individualized and that Plaintiffs have failed to meet their burden of showing  a "uniform,

nationwide policy"  that supports collective treatment."  (Mot. Decert. 17-20.)

Several courts have held that putative class members must show they were affected by a

common policy, plan, pattern or practice in order to proceed collectively under Section 216(b) of

the FLSA.  *See, e.g.*, *Aguirre v. SBC Communications, Inc.*, No. Civ.A. H-05-3198, 2006 WL

964554, at *5 (S.D. Tex. 2006) (noting that, at least at the first step, "A court may deny

plaintiffs' right to proceed collectively if the action arises from circumstances purely personal to

the plaintiff, and not from any generally applicable rule, policy, or practice." (citing *England v.*

*New Century Fin. Corp.*, 370 F.Supp.2d 504, 507 (M.D. La. 2005)), *Hill*, 2005 WL 3526669, at

*3  ("[I]f there is sufficient evidence of an employer's pattern of subjecting employees to the

same improper practice, that would be sufficient to warrant a finding of similarity justifying

collective adjudication."); *O'Brien v. Ed Donnelly Enterprises, Inc*., No. 2:04-CV-00085, 2006

WL 3483956, at *3 (S.D. Ohio Nov. 30, 2006) ("Plaintiffs must demonstrate that the Defendants

had a common policy or plan in violation of the FLSA that negatively impacted the original and

opt-in Plaintiffs." (internal citations omitted)); *Bonilla v. Las Vegas Cigar Co.*, 61 F.Supp.2d

1129, 1139 n.6 (D. Nev. 1999) ("In order to be similarly situated, the action must not be distinct

and specific to individual plaintiffs; rather, there must be some general policy or practice."

(internal citations removed)).  At least one circuit has held, however, that "a unified policy, plan,

or scheme of discrimination may not be required to satisfy the more liberal 'similarly situated'

requirement of § 216(b)." *Hipp*, 252 F.3d at 1219 (citing *Grayson v. K Mart Corp.*, 79 F.3d

1086, 1095, 1097 (11th Cir. 1996) (discussing similarly situated requirement in an ADEA suit);

*see also Frank*, 1983 WL 643 at *2 (refusing to decertify a collective action where plaintiffs'

"specific complaints were not identical" and stressing that "to deny them class treatment would

be tantamount to declaring that any employer can escape ADEA class liability so long as it

discriminates against a diverse group of aged employees over a wide geographic range in a

number of ways . . . .").  The District Court for the Southern District of Florida also recently held

that the "unified policy, plan or scheme" standard "is more appropriately applied at the first stage

of the analysis."  *Pendlebury*, 518 F. Supp. 2d at 1348 n.3.  Ultimately, the Court believes that, at

a minimum, there must be "meaningful 'identifiable facts or legal nexus [that] bind the claims,'"

*Simmons v. T-Mobile*, No. H-06-1820, 2007 WL 210008, at * 8 (S.D. Tex. Jan. 24, 2007) (citing

*Aguirre*, 2006 WL 964554, at *5), so that hearing the cases together furthers the purposes of

section §216, is fair to both parties, and does not result in an unmanageable trial.  *See also Hill*,

2005 WL 3526669, at *3 ("At the core of the 'similarly situated' inquiry is the question whether

the issues in the case can be adjudicated collectively."); *Olivo v. GMAC Mortg. Corp.*, 374

F.Supp.2d 545, 548 n.2 (E.D. Mich. 2004) (noting that, at step two, the court would consider

"whether certification would serve the purposes of a collective action under § 216(b), and then

weigh the benefits of a collective action against the prejudice to the defendant and any judicial

inefficiencies that could result from allowing Plaintiffs to proceed collectively." (internal

citations omitted)).

 After carefully reviewing the substantial discovery completed by the parties, the Court

concludes that the opt-in Plaintiffs are, in fact, similarly situated.  Although the opt-ins worked at

different stores under the supervision of different individuals, there is no dispute that all of the

opt-ins held the same job title and worked under the exact same job description and supervision

hierarchy.   All were reclassified as non-exempt in October 2002, were subsequently scheduled

to work no more than 40 hours per week, and were subject to the same pay provisions and written performance reviews.  Furthermore, Plaintiffs have also provided significant evidence in support of their claim that all of the opt-ins either worked off-the-clock or had time shaved off of their hours by Store Managers when they attempted to record all of the hours they actually worked.  Finally, Plaintiffs have made a strong showing that Starbucks' general policy of requiring ASMs to perform job duties that could not easily be completed within 40 hours while, at the same time, strongly discouraging overtime after the reclassification, failing to increase labor budgets, and basing bonuses, at least in part, on labor hours created an environment that at least strongly motivated managers to commit the alleged FLSA violations.  *See Wilks v. Pep Boys*, Slip Copy, No. 3:02-0837, 2006 WL 2821700, at *6 (M.D. Tenn. 2006); (*see also* Johnston Tr. 57 (describing pressures to complete job duties within 40 hours and conflicting pressure not to work overtime as a "Catch 22"); McCutchen Tr. 139 ("[I]t seemed to be the culture.  It seemed to be expected.  No one expected it not to happen."); Good Tr. 198 (agreeing that off-the-clock work was his experience of the Starbucks corporate culture).  This is true despite the fact that Starbucks had an official "time worked is time paid" policy.  Defendants correctly note that it is not unlawful for an employer to have a policy of discouraging overtime.  Where such a policy, however, in combination with other factors, leads to a consistent pattern of FLSA violations, it can support a finding that Plaintiffs are similarly situated for purposes of section 216.

Although the incentives created by Starbucks' conflicting mandates may not have led all managers nationwide to act in lockstep, *see*, *e.g.*, Fernandez, Tr. at 25-26, (admitting that as a Store Manager he currently ensures that ASMs do not work off-the-clock); Huffman Tr. at 151 (acknowledging that, as Store Manager, she tried to discourage off-the-clock work), the

deposition testimony supports a finding that the opt-in plaintiffs currently before the Court were, in fact, affected similarly.  It would certainly not be in the interest of judicial economy to decertify a class of similarly situated plaintiffs simply because, after discovery, it becomes apparent that the alleged policy was not as uniform as plaintiffs believed at step one.  An employer should not be allowed to escape class liability simply because some managers do not commit FLSA violations as long the evidence shows that there is a factual or legal nexus that binds together the claims of the opt-in plaintiffs before the Court.

That ASMs did not perform exactly the same duties off-the-clock does not undermine the conclusion that the putative class is similarly situated.  All of the deposed opt-ins allege that they were not compensated for job duties they performed over 40 hours either because they worked those hours off-the-clock or because managers shaved time off of hours they reported.[8]  Nor does the fact that all of the putative class members were paid *some* overtime defeat a finding of similarly situated, given that all of the deposed opt-ins also consistently claim that they were not paid overtime for *all* of the hours they worked.  Finally, the fact that Store Managers were allowed to vary from set labor budgets to some degree and may have been allowed more leeway with overtime hours, for example, at certain times of the year does not change the fact that Plaintiffs have presented significant evidence that the environment created by Starbucks' policies appears to have led to a pattern of off-the-clock work and time shaving.

---

[8] Defendants note that opt-in Dvir alleges that she babysat for her store manager off-the-clock.  While Dvir did state in her deposition that she was required to do personal favors for a Store Manager such as babysitting (Dvir Tr. 79-80, 132-33), Dvir also stated that she performed tasks off-the-clock such as reviewing reports (Dvir, Tr. at 144), cleaning the store (Dvir Tr. 97-98, 118, 127), making sure the store "looked right" (Dvir Tr. 118), and filing (Dvir Tr. 132).  She also claims that her Store Manager shaved the hours that she did report.  (Dvir Tr. 91.)  Although Dvir does not explicitly state that she was led to perform these tasks off-the-clock because she could not complete her job duties in 40 hours, the fact that she performed such work is at least consistent with the theory advanced by Plaintiffs. Furthermore, to the extent they wish to challenge certain hours as not compensable work, Defendants are entitled to raise that argument as a defense.

Defendants also contend that the existence of a policy or practice is belied by the fact that Plaintiffs had different motives for working off-the-clock.  The Court initially notes that for purposes of liability under Section 207 of the FLSA, Plaintiffs need not prove that Defendants engaged in a pattern or practice of denying unpaid overtime, nor are Plaintiffs' motives for working off-the-clock of any relevance. 29 U.S.C. 207(a)(1).  The testimony about the opt-ins' motives cited to by Defendants does not undermine the Court's finding that Plaintiffs are similarly situated.  First of all, several of the deposed opt-ins state that they worked off-the-clock either because a Store or District Manager directed them to or implied they should.  (*See, e.g.*, Fernandez Tr. 54-55, 58; Falcon Tr. 102-04; Brantley Tr. 65, 78-79; McCutchan Tr. 102-03; Lambert Tr. 48; Dvir Tr. 98-99; Chizmadia Tr. 99; Masse Tr. 45-46, 58-59.)   The fact that some ASMs thought they would get a promotion or a higher bonus for doing so only confirms that the environment created by Starbucks' conflicting signals laid the groundwork for FLSA violations.  Many opt-ins who stated that they sometimes forgot to clock-in or weren't sure that certain work was compensable also allege that when they did report all of their overtime hours, it was shaved from their paycheck.[9]  (*See* Spear Tr. 105-107; Crociani Tr. 53-59; Dvir Tr. 113-15.).  To the

---

[9] Another opt-in Plaintiff, Ms. Kooyenga, also claims that some of her off-the-clock work occurred because she inadvertently forgot to clock in.  Ms. Kooyenga additionally claims, however, that she worked off-the-clock one New Year's Eve to fill in for a pregnant co-worker and was never compensated for that time. (Kooyenga Tr. at 46-47.)  Her explanation for why she did so again highlights the bind that ASMs were in:  "We had just gotten a bulletin from our [District Manager], no overtime for the assistant managers.  And I had tried to reach my DM and left him a voicemail letting him know that I would be working the overtime as I couldn't reach [my Store Manager].  And I did not want to receive repercussions for not [sic] getting more unapproved overtime."  (Kooyenga Tr. at 44).  Kooyenga further elaborated on why she clocked out and continued working on New Years' Eve:  "[W]e had just received admonishments . . . for having worked overtime . . . .  And I didn't want to incur any more wrath . . . from the DM or from [the Store Manager], because they seemed very upset about the numbers and about the fact that they were paying us overtime."  (Kooyenga Tr. at 50.)  Kooyenga also explained in her deposition that after the reclassification, despite the fact that she was supposed to have a lighter work load, she "was still working about 50 [hours a week], not all clocked in."  (Kooyenga Tr. at 54.)  Thus, Kooyenga's testimony  is similar to that of the other opt-ins regarding the difficulties ASMs faced after the reclassification.

Defendants further note that opt-in Plaintiff Bejarano states that she sometimes forgot to clock in. (Bejarano Tr. at 49-50.)  Ms. Bejarano's testimony also indicates, however, that she felt that she had to work off the clock "because there was a thousand things to do and eight hours to do it in and it was expected of me to get it done" and because she knew that logging all hours as overtime "the bottom line, it would mess us up.  So it was easier for

extent that Defendants believe that managers may not have been aware of at least two opt-ins'

off-the-clock work, (*see, e.g.*, Bejarano Tr. 30-32, 40-43, 61-63; Spear Tr. 139-144), [10] or that an

ASM performed tasks that were not actually compensable, (*see* Dvir Tr. 79), they will certainly

be entitled to raise those issues as defenses.  As explained below, the Court believes that these

defenses are not so individualized that they cannot be addressed by representative testimony.

Nor is the Court persuaded by Defendants' argument that the relatively small response to

Plaintiff's notice justifies decertification because it suggests that there is no general policy or

plan.[11]  Individuals may have myriad reasons for not wishing to opt-in to a lawsuit against their

employer ranging from fear of retaliation to sheer inertia, and the Court declines to draw any

particular inference from the response size.  The Court realizes that other courts have considered

response rates when determining the existence of a generalized policy or plan, *see, e.g.*,  *Smith v.*

*T-Mobile USA, Inc*., No. CV 05-5274 ABC, 2007 WL 2385131, at *6 (C.D. Cal. Aug. 15, 2007),

but also notes that other district courts have allowed suits involving a far smaller response rate to

proceed collectively, *see, e.g.*, *Wilks*, 2006 WL 2821700, at *1 (allowing putative class of 356

members to proceed collectively where notice was initially issued to 90,000 current and former

employees).  Furthermore, the response size seems irrelevant to whether the opt-ins actually

before the Court appear to be similarly situated.

---

me to clock out, work an extra 20 minutes, get the store cleaned up and set it up for my next employee coming in and just eat the 20 minutes and go home." (Bejarano Tr. at 29.)

[10] In their Reply Brief, Defendants also allege that opt-in McCutchen admitted that his manager likely did not know of his off-the-clock work.  (Def. Reply at 8.) McCutchen stated repeatedly in his deposition, however, that he believed that his store manager knew he was working off-the-clock.   (*See, e.g.*, McCutchen, Tr. at 102-107 (stating store manager knew off-the-clock work was happening because she witnessed it or it was reported to her and explaining, for example, that he would tell his store manager he was not clocked in when making a milk run or bank deposit "every time she was in the store" and that they would tell her that they were making out of town trips for the store on their own time.).)

[11] Of the 11,000 notices sent out, Plaintiff contends that 2,000 were returned as undeliverable.  372 of the remaining 9,000 ASMs that were notified chose to opt-in to the lawsuit, and 355, or 3.9%, remain as putative class members.

The Court recognizes some disparity in Plaintiffs' testimony regarding off-the-clock hours worked at charitable or catering events. For example, at least one opt-in Plaintiff claims he never participated in a charitable event and that his store did not cater events, (*see* Brantley, Tr. at 101-02), at least two opt-ins claim they did not participate in volunteer activities (*see* Crociani, Tr. at 109-10; Johnston, Tr. at 137); and at least one opt-in plaintiff states that she was not requested to attend any catering events (*see, e.g.*, Olson-Young Tr. at 163). If the only alleged nexus among the Plaintiffs was participation in charitable and catering events, these discrepancies might counsel a different result. That is not the case before the Court.

Defendants generally point to a number of district court decisions decertifying collective actions based on allegations that an employer has an unwritten policy requiring employees to work off-the-clock. Some of the cases cited by Defendants denied conditional certification at step one or in a combined step one/step two decision because Plaintiffs did not present enough proof. For example, in *Simmons v. T-Mobile*, the court denied certification of a putative class in a case involving claims that an employer required off-the-clock work. No. H-06-1820, 2007 WL 210008 (S.D. Tex. Jan. 24, 2007). The court in *Simmons* stressed repeatedly, however, that the named Plaintiff had presented *no* affidavits from any other Senior Retail Sales Representative (SRSR)—the exact group he purported to represent—alleging that she had worked off-the-clock to complete her duties. *Id.* at *1, *3, *5, *7, *8. Instead, the court noted that "[t]here is . . . *no* admissible proof from or about any specific SRSR other than Simmons (and his overly general statements about others) that supports his claims that *SRSRs* commonly work unpaid overtime," and emphasized that Simmons had not "adduced *any* probative evidence" that the supplementary tasks and sales duties required of SRSRs "typically required other SRSRs to work more than forty hours per week and thus that SRSRs (as a group or in substantial numbers) are required . . .

to work uncompensated overtime." *Id.* at *7 (emphasis added).  Likewise, in *Basco*, the district court underscored the "extremely anecdot[al] deposition testimony presented by Plaintiffs that only showed one manager had required off-the-clock work 'perhaps once or twice during the course of a plaintiff's work.'" 2004 WL 1497709, at *6 (denying certification in a joint step one and step two decision); *see also Robinson v. Dolgencorp, Inc.*, 2006 WL 3360944 (M.D. Fla. 2006) (refusing to conditionally certify a collective action involving allegations of an unofficial policy requiring off-the-clock work where the proposed class had different job duties and plaintiffs had filed only two affidavits alleging the same FLSA violations).  By contrast, Plaintiffs in this case have provided numerous declarations and detailed depositions attesting to the fact that, as ASMs, they regularly worked more than 40 hours to complete their job duties and were not compensated for all of the overtime hours they worked.[12]

The Court recognizes that some district courts have held that a lawsuit involving allegations of an informal policy requiring off-the-clock work cannot be litigated collectively where a large number of plaintiffs were employed at many different locations and the decision to allow or require off-the-clock work was carried out by individual managers.  *See, e.g.*, *West v. Border Foods, Inc.*, No. 05-2525, 2006 WL 1892527 (D. Minn. Jul. 10, 2006); *Johnson v. TGF Precision Haircutters, Inc.*, No. H-03-3641, 2005 WL 1994286, at *2, *5 (S.D. Tex. Aug. 17, 2005) (decertifying class where conditionally certified class also included two groups of employees having "quite different and distinct primary job duties" many of whom "were compensated in a fluctuating commission system"); *Ray v. Motel 6 Operating, Ltd. Partnership*, WL 938231, *4 -5  (D. Minn. 1996).  This Court must respectfully disagree with the analysis in those decisions, which, of course, is not binding.  It simply cannot be that an employer may

---

[12] The Court acknowledges Defendants' submission of depositions from Houston area ASMs stating that they did not work off-the-clock to complete their job duties.  For purposes of this motion, however, the Court is convinced that putative class members have provided sufficient evidence that they are, in fact, similarly situated in this regard.

establish policies that create strong incentives for managers to encourage or allow employees to work off-the-clock, and avoid a FLSA collective action because a large number of employees at a number of different stores are affected.  To a certain extent, any large class of employees working for a nationwide employer alleging FLSA overtime violations will encounter these difficulties, and there is no indication that Congress intended section 216 to only allow small collective actions involving unpaid overtime to proceed.  *See also Donohue v. Francis Services, Inc.*, No. Civ.A.04-170, 2004 WL 1406080 at *1 (E.D. La. June 22, 2004) (refusing to decertify a collective action on allegations that the class was too large and noting that "[a]dopting defendants' reasoning would lead to the absurd result that employers could escape FLSA liability by making sure to underpay vast numbers (rather than smaller numbers) of their employees.").

The Court therefore finds that there is a meaningful nexus that binds Plaintiffs' claims together and that the similarities in their claims outweigh their differences.

**B.    Individualized Defenses**

The Court is not convinced that Defendants' defenses are so individualized that collective adjudication of this claim is unworkable.  Defendants claim that individual "mini-trials" will be needed to determine whether {laintiffs' off-the-clock activities were compensable work, whether Defendants had actual or constructive knowledge of any off-the-clock work performed by Plaintiffs, whether some of the off-the-clock work is *de minimis*, and whether some of the work performed at charitable events was compensable or instead was voluntary as defined by 29 C.F.R. §785.44.  The Court agrees with Plaintiffs, however, that based on the current record, these defenses can be adequately raised at a trial involving representative testimony.  Courts have allowed the use of representative testimony in cases involving allegations of unpaid overtime.  *See, e.g.*, *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946); *Schultz*

*v. Capital Intern. Sec., Inc.* 466 F.3d 298, 310 (4th Cir. 2006); *Grochowski v. Phoenix Constr.*,

318 F.3d 80, 88 (2d Cir. 2003) ("[N]ot all employees need testify in order to prove FLSA

violations or recoup back-wages"); *Reich v. Gateway Press*, 13 F.3d 685, 701-02 (3d Cir. 1994)

("Courts commonly allow representative employees to prove violations with respect to all

employees."); *Brennan v. General Motors Acceptance Corp.*, 482 F.2d 825, 829 (5th Cir. 1973)

(allowing representative testimony in a case involving unpaid overtime); *Thiebes v. Wal-Mart

Store, Inc.*, 2004 WL 1688544, at *1 (D. Or. July 26, 2004); *National Electro-Coatings, Inc. v.

Brock*, No. C86-2188, 1988 WL 125784, at *8 (N.D. Ohio July 13, 1988) ("Courts have

consistently allowed, or even required, a small number of employees to testify to establish a

pattern of violations for a larger number of workers."); *see also* THE FAIR LABOR STANDARDS

ACT 1333 (Ellen C. Kearns et al., eds. 1999) (noting that it is "well settled" that "not all affected

employees must testify in order to prove violations or to recoup back wages.  Rather, in most

cases, employees and the Secretary may rely on representative testimony.").  In *Wilks*, the district

court refused to decertify an off-the-clock collective action based on individualized defenses,

explaining:

> After considering the defenses that will likely be appropriate in this case, the court
>
> finds that each of them could be raised in a collective forum, where the defendant
>
> will be free to present evidence of its lawful employment policies and practices, to
>
> cross-examine individual representative plaintiffs, and to call to the stand others
>
> with material testimony that helps the defendant's case.

2006 WL 2821700, at *5; *see also Rodolico v. Unisys Corp.*, 199 F.R.D. 468, 484 (E.D.N.Y.

2001) ("[S]tanding alone, the prospect of individual defenses should not defeat authorization of a

collective action . . . .").  The Court similarly finds that Defendants will be allowed to raise all of

its asserted defenses by examining representative plaintiffs and presenting its own evidence at trial.  Furthermore, pursuant to FED. R. CIV. P. 42(b), the Court is willing to consider bifurcating the liability and damages stage of the trial if it will be in the interest of judicial economy.  *See Thiebes v Wal-Mart Store, Inc.*, No. Civ. 98-802-KI, 2004 WL 1688544, at *1 (D. Or. July 26, 2004) (noting that the court had bifurcated collective action involving allegations of unpaid overtime and off-the-clock work into separate liability and damages trials).

      **C.**     **Fairness and Procedural Considerations**

      The Court is quite persuaded that fairness considerations militate in favor of allowing this lawsuit to proceed collectively.  Decertifying this class would be contrary to both of the purposes of Section 216 of the FLSA.  First, given the substantial similarity of the putative class members' claims, it certainly would not be in the interest of judicial economy to require the claims to be adjudicated in 355 individual trials.  Furthermore, the FLSA is a remedial statute, *see, e.g., Reich v. Circle C. Investments, Inc.*, 998 F.2d 324, 329 (5th Cir. 1993) (recognizing FLSA's remedial purposes); *Prickett*, 349 F.3d at 1296 ("FLSA is a remedial statute that has been construed liberally to apply to the furthest reaches consistent with congressional direction." (internal citations removed)), and the Supreme Court has acknowledged that Congress intended to give "plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources," *Hoffman*, 493 U.S. at 170.   As the district court in *Bradford v. Bed Bath and Beyond* noted, plaintiffs can "hardly be expected to pursue these small claims individually, so there is little likelihood that their rights will be vindicated in the absence of a collective action." 184 F. Supp. 2d 1342, 1351 (N.D. Ga. 2002); *see also Pendlebury*,  518 F. Supp. 2d at 1363 (noting that "Defendant's suggestion that few Plaintiffs would re-file is the precise reason Congress authorized class action treatment for these types of cases.").  Although the remedial nature of the

21

FLSA, standing alone, does not justify allowing a case to proceed collectively, it does at least suggest that a close call as to whether Plaintiffs are similarly situated should be resolved in favor of certification.

Although Defendants urge that collective adjudication of this claim might impinge on their due process rights, the Court must balance those rights with the due process owed to Plaintiffs. *See, e.g.*, *Wilks*, 2006 WL 2821700, at *8 ("Although the defendant contends that decertification is necessary to protect its due process rights . . . these rights must be balanced with the rights of the plaintiffs" (citing *Glass v. IDS Financial Services, Inc.*, 778 F. Supp. 1029, 1081-82 (D. Minn. 1991)).  The Court therefore concludes that fairness considerations support a decision to not decertify this action.

Finally, the Court recognizes that a collective action involving widespread off-the-clock claims may involve a large number of fact witnesses and that the location of the trial in Texas may require several of those witnesses to travel.  The Court believes, nevertheless, that this case will be manageable at trial.  If, at any time, the Court reaches the conclusion that Plainitffs' claims or Defendants' defenses cannot be adequately raised through representative testimony or that trial will be too unwieldy for the jury, the Court will reconsider this decision.

Defendant's motion is therefore **DENIED**.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this the 15th day of January, 2008.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE